1  ROBBINS GELLER RUDMAN
      & DOWD LLP
2  X. JAY ALVAREZ (134781)
   JULIE A. KEARNS (246949)
3  655 West Broadway, Suite 1900
   San Diego, CA  92101-3301
4  Telephone:  619/231-1058
   619/231-7423 (fax)
5  jaya@rgrdlaw.com
   jkearns@rgrdlaw.com
6
   Lead Counsel for Plaintiff
7
   [Additional counsel appear on signature page.]
8
                    UNITED STATES DISTRICT COURT
9
                  SOUTHERN DISTRICT OF CALIFORNIA
10
11  CONSTRUCTION WORKERS PENSION          )  Master File No. 3:10-cv-02502-CAB-DHB
    TRUST FUND – LAKE COUNTY AND          )
12  VICINITY, Individually and on Behalf of All  )  CLASS ACTION
    Others Similarly Situated,             )
13                                          )  AMENDED CONSOLIDATED CLASS
                        Plaintiff,          )  ACTION COMPLAINT FOR VIOLATIONS
14                                          )  OF THE FEDERAL SECURITIES LAWS
          vs.                               )  AND JURY DEMAND
15                                          )
    GENOPTIX, INC., et al.,                 )
16                                          )
                        Defendants.         )
17  _____ )
18
19
20
21
22
23
24
25
26
27
28

746701_1

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

JURISDICTION AND VENUE ............................................................................5

PARTIES ................................................................................................................5

BACKGROUND TO THE CLASS PERIOD ......................................................8

DEFENDANTS' FALSE AND MISLEADING STATEMENTS ISSUED DURING THE
    CLASS PERIOD.............................................................................................10

THE MARKET BEGINS TO LEARN THE TRUTH.......................................28

CONFIDENTIAL WITNESS ALLEGATIONS SUPPORTING FALSITY AND
    SCIENTER ....................................................................................................44

SCIENTER ...........................................................................................................54

    Defendants Assured Investors They Consistently Tracked Sales Volumes and
        Trends Concerning Its Core Product.........................................................55

    Defendants' Class Period Insider Selling, Criticized by Analysts and the Media,
        Supports a Strong Inference of Scienter ...................................................56

    Executive Compensation ...............................................................................59

    SOX Certifications...........................................................................................63

DEFENDANTS' FALSE AND MISLEADING STATEMENTS ARE NOT
    PROTECTED BY SAFE HARBOR ............................................................65

FRAUD-ON-THE-MARKET PRESUMPTION...................................................66

PROXIMATE LOSS CAUSATION/ECONOMIC LOSS .................................67

CLASS ALLEGATIONS .....................................................................................68

COUNT I ...............................................................................................................69

    Violation of §10(b) of the 1934 Act and Rule 10b-5 Promulgated Thereunder
        Against All Defendants..............................................................................69

COUNT II ..............................................................................................................71

    Violation of §20(a) of the 1934 Act Against All Defendants...........................71

PRAYER FOR RELIEF .......................................................................................71

JURY TRIAL DEMANDED..................................................................................72

**INTRODUCTION**

1.    This is a securities class action on behalf of all persons who purchased or otherwise acquired the common stock of Genoptix, Inc. ("Genoptix" or the "Company") between July 31, 2009 and June 16, 2010, inclusive (the "Class Period"), against Genoptix and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 (the "1934 Act").

2.    During the Class Period, defendants made materially false and misleading statements to the market by touting increasing and strong demand that currently existed for its "bread-and-butter core product," which consisted of diagnostic testing services that analyzed blood and/or bone marrow samples for disease, when in fact demand by its primary customers was declining. Defendants also knowingly misrepresented the Company's ability to achieve significant revenue and earnings per share ("EPS") growth quarter over quarter in light of steadily decreasing trends in demand.

3.    Leading up to and during the Class Period, defendants repeatedly informed the market that expanding the Company's sales force was the primary driver for continued growth, specifically asserting that each sales representative on staff at Genoptix directly translated into increased revenues because every new set of "feet on the street" captured the strong demand that currently existed for the Company's core product.  Defendants went so far as to quantify for investors the incremental revenue they purportedly knew, based on internal Company sales data meticulously tracked by executive management, could be achieved by each sales representative on an annual basis – which they touted amounted to $2.5 million per sales representative.  By the start of the Class Period, however, defendants were aware that numerous sales representatives from widespread geographical regions were experiencing similar declining customer demand and negative sales trends.  These undisclosed trends were uniquely detrimental to Genoptix because it operated as an out-of-network health care services provider, an operational decision that defendants assured investors during the Class Period was ***not*** negatively impacting physician demand, case volumes or its overall financial position.

4.    At the start of the Class Period, defendants announced an increase in Genoptix's fiscal year ("FY") 2009 revenue, net income and EPS guidance, assuring the market the Company's

1   growth was sustainable based on internal Company data.  Defendants knew, however, that no

2   reasonable basis existed to justify the issuance of the guidance they provided to the market during

3   the Class Period.

4        5.     Defendants failed to disclose that competition with a growing number of in-network

5   service providers, particularly as the market was becoming more saturated with competitors, was

6   having a unique and detrimental impact on Genoptix's sales and corresponding revenue throughout

7   the Class Period due largely to its status as an out-of-network healthcare service provider.  In 2009,

8   Genoptix sales representatives were one of perhaps two or three individuals calling on doctors on a

9   weekly basis to sell its services, but by 2010 this number multiplied to between nine and ten per

10  week, giving Genoptix physician customers far more in-network options.  These growing in-network

11  provider options for doctors prompted them to reduce or altogether eliminate the use of Genoptix

12  services because the latter's out-of-network status presented certain unique problems.  Throughout

13  the Class Period, for example, physicians informed Company sales representatives their patients

14  were receiving Explanation of Benefits ("EOB") documents from their insurance company that

15  appeared to hold them responsible for significant out-of-network fees.  Although the patients were

16  not ultimately charged additional fees, certain doctors stopped using Genoptix's diagnostic testing

17  services specifically because of this problem.  Physicians avoided this unnecessary trouble by simply

18  switching to one of the Company's in-network competitors.   Moreover, beginning in 2009,

19  Genoptix's physician customers were facing economic pressures and thus were closing their private

20  practices to go work for hospitals.  This trend significantly increased by the start of 2010, and had a

21  severe, negative impact on sales and revenue because hospitals were primarily in-network.  As such,

22  hospitals predominantly used in-network and/or in-house diagnostic testing service providers instead

23  of Genoptix, yet Company management was unwilling to implement a reasonable plan to expand

24  into the hospital market during the Class Period.

25       6.     Defendants further knew by the start of the Class Period that Genoptix was losing the

26  Georgia Cancer Center, its largest account responsible for between $15 million to $20 million, or

27  approximately 8% to 11% of Company revenue during FY09, as a direct result of defendants' refusal

28  to enter into a client-billing arrangement despite the Georgia Cancer Center's strenuous requests.  As

1    of at least February 2010, Genoptix had in fact lost the Georgia Cancer Center account due to

2    defendants' unwillingness to enter into the requested billing arrangement.  During 2009 and 2010,

3    the Company also lost other customers as a result of defendants' refusal to enter into client-billing

4    relationships where such arrangements were permitted.

5          7.      Defendants were aware of these true facts at the time they issued false and misleading

6    statements during the Class Period.  As they repeatedly emphasized to investors, defendants

7    carefully tracked numerous metrics that documented actual physician demand and sales trends,

8    which was "measure[d] probably 1000 different ways" at Genoptix.  Defendants further assured the

9    market "*[e]verything is shared with management all the way down through the organization*."

10   Defendants therefore witnessed the negative sales trends and decreasing customer demand

11   experienced by the Company's sales force first hand.

12          8.      In addition, Genoptix Chief Executive Officer ("CEO") and defendant Tina S. Nova

13   ("Nova") participated in biweekly national calls among sales representatives and managers, during

14   which the significant and detrimental impact on customer demand that was being caused by the

15   issues described above (*i.e.*, the unique problems faced by Genoptix as an out-of-network provider –

16   particularly in light of private physicians going to work for in-network hospitals, increased

17   competition by in-network providers, and EOB/billing issues causing distress to patients and thus

18   their doctors) were discussed.

19          9.      On May 6, 2010, in the face of declining demand and decreasing sales, defendants

20   were forced to announce a major miss to consensus revenue and EPS estimates for 1Q10.  They

21   failed, however, to revise FY10 guidance to more appropriately reflect actual demand.  Rather,

22   defendants affirmed previously issued guidance that they knew could not be achieved.  Although

23   defendants characterized it as a one time hit to revenue and blamed a purportedly pre-planned

24   reconfiguration of the sales department during the quarter – namely the shift of quota bearing sales

25   representatives to non-revenue generating management positions – defendants were aware of the true

26   reasons actual demand was declining and misleadingly provided a non-culpable excuse.  Analysts

27   recognized that defendants directly attributed Genoptix's 1Q10 "disappointing results" to fewer sales

28   representatives' "feet on the street," and noted the supposedly pre-planned "*shift could have been*

1   *better signaled, which would have prepared the market for these results*."  Defendants' revelation

2   that the Company's revenue and EPS figures for 1Q10 missed consensus estimates caused a drop in

3   Genoptix's share price, however their failure to disclose the truth regarding continuing, declining

4   physician demand and their reaffirmation of unreasonable FY10 guidance caused the stock price to

5   remain artificially inflated.

6        10.    On June 16, 2010, the last day of the Class Period and just six weeks after defendants

7   reaffirmed FY10 guidance, defendants were finally forced to drastically reduce FY10 guidance and

8   admit Genoptix's pace of growth was unsustainable due to the known, negative sales trends

9   described above that had in fact existed during the Class Period.

10       11.    Analysts reacted harshly to defendants' June 16, 2010 disclosures, and some clearly

11  felt they had been misled by the defendants.  A June 18, 2010 report, for example, noted:

12  "*Breathtakingly poor management of recent expectations questions management's*

13  *credibility . . . .  We don't buy all of GXDX's explanations*."

14       12.    As a result of defendants' false statements during the Class Period, Genoptix's stock

15  traded at artificially inflated prices during the Class Period, reaching a high of $38.79 per share on

16  April 30, 2010.  Following defendants' Class Period ending disclosure, however, the Company's

17  shares were subject to massive sales, sending their price down over 55% from the Class Period high.

18       13.    Defendants' personal financial motives were not lost on the market during the Class

19  Period, and further support a strong inference of scienter.  Although the defendants' lucrative Class

20  Period compensation worth millions of dollars was based primarily on the Company's financial

21  performance, their fuzzy public disclosures on the topic prompted one analyst to request additional

22  information about these payments in July 2009, but defendants refused to provide further detail.

23  And then in response to Genoptix's major miss versus 1Q10 consensus revenue and EPS estimates

24  in May 2010 due to declining case volumes, another analyst questioned defendants' compensation

25  but similarly received little information in response, noting during Genoptix's July 2010 earnings

26  conference call:  "I do see you receive some compensation for adding capacity.  *And I guess a critic*

27  *might say that this might have driven some of the sales force . . . additions ahead of a slowdown*

28  *that was maybe more visible to some of your competitors*."  Furthermore, defendants profited by

1    millions of dollars through the insider selling of their shares of Genoptix stock during the Class

2    Period.  A February 2010 *Street Sweeper* article explicitly criticized suspicious Class Period sales

3    made by defendants Nova and Samuel D. Riccitelli ("Riccitelli"), noting their significant disposal of

4    Company shares would allow them to "***largely escape any future pain felt by ordinary investors***."

5          14.    Finally, and as is discussed in detail *infra* at ¶48, defendants' purported risk

6    disclosures did not meaningfully warn investors of the specific, adverse risks that defendants either

7    knew had already come to fruition or were about to be realized during the time they were issuing

8    false and misleading statements during the Class Period.  And as such, these disclosures were not

9    meaningful so as to invoke the Private Securities Litigation Reform Act of 1995's ("PSLRA")

10   statutory safe harbor protection.

11   **JURISDICTION AND VENUE**

12         15.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934

13   Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the Securities and

14   Exchange Commission ("SEC") (17 C.F.R. §240.10b-5).

15         16.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C.

16   §1331 and §27 of the 1934 Act (15 U.S.C. §78aa).

17         17.    Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C.

18   §1391(b), as many of the acts and practices complained of herein occurred in substantial part in this

19   District.

20         18.    In connection with the acts alleged in this Complaint, defendants, directly or

21   indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to,

22   the mails, interstate telephone communications and the facilities of the national securities markets.

23   **PARTIES**

24         19.    By Court Order dated April 6, 2011, City of Ann Arbor Employees' Retirement

25   System (the "City of Ann Arbor") was appointed as Lead Plaintiff in this action (Dkt. No. 18).  As

26   set forth in the certification of City of Ann Arbor, filed in connection with its motion to be appointed

27   Lead Plaintiff, City of Ann Arbor purchased Genoptix securities during the Class Period and, as a

28

1   result of defendants' conduct alleged herein, suffered damages in connection with the purchase of

2   Genoptix securities.

3          20.    Defendant Genoptix provides diagnostic testing services for hematomalignancies, or

4   cancers of the blood and bone marrow, including COMPASS (which stands for Comprehensive

5   Assessment) and CHART, exclusively to community-based hematologists and oncologists in private

6   practice.  Genoptix was founded in 1999 and traded on the Nasdaq during the Class Period.  The

7   Company completed an Initial Public Offering ("IPO") on November 2, 2007.  COMPASS was

8   labeled the Company's "bread-and-butter core product" by defendant Samuel D. Riccitelli during the

9   Bank of America Securities Mid Cap Conference on September 21, 2009.

10          (a)    On January 24, 2011, Novartis AG announced it agreed to buy Genoptix for

11   $470 million in cash purchasing all outstanding shares of common stock of Genoptix at USD $25.00

12   per share.  Each of Genoptix's directors and executive officers agreed to tender their shares in the

13   offer.  Genoptix became an indirect subsidiary of Novartis AG on February 28, 2011.

14          21.    Defendant Tina S. Nova, Ph.D. served as the Company's President and CEO as well

15   as a member of the Board of Directors, from March 2000 through the Class Period.  During the Class

16   Period, Nova sold 102,978 shares of her Genoptix stock for proceeds of nearly $3.4 million.

17          22.    Defendant Douglas A. Schuling ("Schuling") served as the Company's Chief

18   Financial Officer ("CFO") and Executive Vice President ("EVP") from April 1999 through the Class

19   Period.  During the Class Period, Schuling sold 34,640 shares of his Genoptix stock for proceeds of

20   nearly $1.2 million.

21          23.    Defendant Samuel D. Riccitelli served as the Company's Chief Operating Officer

22   ("COO") and EVP from October 2001 through the Class Period.  During the Class Period, Riccitelli

23   sold 35,038 shares of his Genoptix stock for proceeds of nearly $1.2 million.

24          24.    Defendants Nova and Schuling signed Sarbanes-Oxley Act of 2002 ("SOX")

25   certifications accompanying Forms 10-Q and/or Forms 10-K filed with the SEC during the Class

26   Period.

27          25.    Defendants Nova, Schuling and Riccitelli (collectively, the "Individual Defendants"),

28   by virtue of their high-level positions with the Company, had access to adverse, undisclosed

information about Genoptix's business, operations, financial statements, markets and present and future business prospects, via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, and reports and other information was provided to them as part of their positions.

26.     By virtue of their high level positions with the Company, the Individual Defendants possessed the power and authority to control the contents of Genoptix's quarterly reports and other public filings, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  Each of the Individual Defendants, by virtue of their high level positions with Genoptix, directly participated in the management of the Company and was directly involved in the day-to-day operations of the Company.  The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, and were aware, or recklessly disregarded, that false and misleading statements regarding Genoptix were being issued, and approved or ratified these statements, in violation of the federal securities laws.

27.     As officers and controlling persons of a publicly-held company whose common stock was traded on the Nasdaq during the Class Period, and governed by the federal securities laws, each of the Individual Defendants had a duty to disseminate promptly accurate and truthful information regarding the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of Genoptix's publicly-traded common stock would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

28.     Each of the defendants is liable as a participant in a fraudulent scheme and course of conduct that operated as a fraud or deceit upon purchasers or acquirers of Genoptix common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme: (i) deceived the investing public regarding Genoptix's business; (ii) artificially

inflated the price of Genoptix's securities; and (iii) caused plaintiff and other members of the class to purchase Genoptix securities at inflated prices.

## BACKGROUND TO THE CLASS PERIOD

29. Leading up to the Class Period, defendants emphasized that Genoptix's business model focused primarily on growth through adding capacity – primarily sales representatives, but also staff hematopathologists and laboratory capacity. Critically, defendants repeatedly stated that the Company's addition of sales representatives would generate incrementally increasing revenue.

30. Schuling described Genoptix targeted local cancer doctors as customers, rather than hospitals, during the October 7, 2008 William Blair & Co. Small-Cap Growth Stock Conference:

> [T]here are approximately 11,000 hematologist/oncologists practicing in the United States. Again, *that's our customer, the hematologist/oncologist*. Of those 11,000, we feel that our target market is about 79% of them, those who are practicing in a community setting. *So we don't target hospitals* . . . .

31. During a conference call hosted by Genoptix on November 6, 2008 to discuss its 3Q08 earnings, Riccitelli informed investors that "*cases per customer per month*" is "*obviously[] a key metric that we track here literally daily*."

32. Analysts heard defendants' message to the market that additional sales representatives directly translated into increased revenues. A January 8, 2009 Oppenheimer analyst report covering Genoptix, for example, reported:

> • Revenue growth has been driven, in large part, by expanding its sales force. As such, we believe having more "feet on the street" is the biggest determinant of revenue growth.

> \*        \*        \*

> *Sales Force Driven Model*

> With the service and technology platform established, *GXDX builds its business primarily by growing its sales force*. Since 2007, GXDX has added almost 20 new sales reps and had a total of 52 reps as of 3Q08. On average, *each sales rep generates annual revenue of approximately $2 million* (from approximately 25-30 ordering hem/oncs).

33. Similarly, on February 27, 2009, a William Blair & Company analyst reported:

> . . . *[I]ncreased "feet on the street" is key to the company's continued market share gains*, in our view.

34.     During a February 26, 2009 conference call with the investment community to discuss the Company's 4Q08 and FY08 financial results, Nova and Riccitelli reiterated the message that Genoptix need only add additional sales representatives to its team to capture existing demand for its core product:

> [Nova:] Currently, we estimate that our market share for bone marrow procedures to be approximately 6% of the 375,000 procedures performed annually in the US.  Over the next three to five years, we'll endeavor to grow our market share to between 15% to 20% of the bone marrow market.  ***To enable this growth initiative, we plan to grow our sales organization*** to include approximately 120 field sales representatives over the next three years.

>                              *          *          *

> [Riccitelli:] ***The primary driver of our growth in customers and cases is a continued expansion of our sales force***.  The ***addition of new feet on the street*** means we can reach more community physicians on a more regular basis to promote our capabilities, but more importantly, to provide the high level of service that's become our hallmark.

35.     Riccitelli also reaffirmed during the February 26, 2009 conference call that Company management continued to track the "***metric***" of "***case per customer per month***" and thus were consistently aware of detailed sales data.

36.     On March 16, 2009, Schuling gave a presentation to the investment community at the Cowen and Company Healthcare Conference, wherein he discussed Genoptix's primary customers, the tracking of sales data by executive management and the direct correlation between the number of sales representatives and the Company's reported revenues:

> ***As far as hem/oncs, the customers that we address***, there are approximately 11,000 of those in the United States.  ***A majority of them, about 79%, 80% of them, work in a community setting***.  So ***they are not attached to a hospital*** . . . .

>                              *          *          *

> A couple of key areas here, sales and marketing. . . .  ***Our Company is and always has been very metric driven, very focused on tracking real-time results*** . . . .

>                              *          *          *

> A little bit about billing and reimbursement.  Obviously it's an important part of any healthcare organization.  We have a very patient and hem/onc friendly billing process.

>                              *          *          *

Lastly, we expect to continue our exceptional growth trajectory. We've given guidance related to 2009 of $170 million in revenue, up approximately 50% year-over-year. *We will increase the number of sales reps as we talked about, which will help to drive that revenue growth*.

37.     In response to an analyst question during the March 16, 2009 presentation, Schuling reiterated defendants were aware of detailed, *non-public* sales data:

Yes, as the physician customer – *the question was relating to reordering rates*, and kind of the stickiness of our customers I think is where you're going.

So we don't give out any metrics specific to that, but *we track them very, very closely in terms of physicians who may not have ordered in a 30-day period or a 60-day period*.

38.     On April 30, 2009, Genoptix issued a press release to announce 1Q09 financial results as well as issue an increased and "Revised 2009 Performance Outlook," stating:

For the full-year 2009, *Genoptix expects revenues of between $170 to $175 million, up from previous expectations* of approximately $170 million, with gross margins in the high-fiftieth percentile.

### DEFENDANTS' FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

39.     **False Statement**:   The Class Period begins on July 31, 2009, following the Company's announcement of further increased FY09 guidance that constituted a false and misleading statement to investors.  On July 30, 2009, after the close of the markets, Genoptix issued a press release announcing 2Q09 financial results and FY09 guidance, which reported, in part, that the Company

reported revenues of $45.3 million for the second quarter of 2009, which . . . increased 62.8% over revenues of $27.8 million for the comparable period in 2008 . . . .

\*        \*        \*

Net income was $7.9 million for the second quarter of 2009, on a tax rate of 43.1%, compared to net income of $5.6 million for the second quarter of 2008, when taxed at a rate of 5.1%.  Diluted earnings per share, or EPS, for the second quarter of 2009 was $0.44 based on 17.8 million weighted average common shares outstanding.

\*        \*        \*

Revenues for the first half of 2009 totaled $84.5 million . . . an increase of 68.6% over revenues of $50.1 million for the comparable period in 2008 . . . .

\*        \*        \*

Recognizing the strength of our collection efforts and financial results in the second quarter, ***Genoptix expects revenues for the full-year 2009 of between $175 and $180 million, an increase from previous estimates of approximately $170 to $175 million***.  Total year gross margins are expected to be in the high-fiftieth percentile.

40.     ***False Statement***:  On July 30, 2009, Genoptix hosted a conference call with the investment community to discuss the Company's 2Q09 financial results and FY09 guidance.  The Individual Defendants participated in the call and had an opportunity to address analysts' and investors' questions and concerns, and correct any inaccurate information or misleading statements. During the call, Nova reiterated Genoptix was currently experiencing ***increasing demand*** for its core services:

Our distinctive physician-directed approach to testing and diagnosis ***continued to drive increasing demand for our services*** in the second quarter as we further expanded our customer base, which grew to a record 1,250 physician customers, up from 1,200 in the first quarter and 850 just one year ago.

\*       \*       \*

Once again, we've successfully executed on our plan to expand our reach and the resulting growth in physician customers and case volumes spurred an increase in revenues this quarter, which were up by approximately 63% from the second quarter of last year while revenues for the first half of 2009 increased approximately 69% over the same period in 2008.

41.     During the July 30, 2009 call, Riccitelli again stressed that the Company's growth strategy was focused on adding sales representatives to capture existing, strong physician demand:

It is our practice to first ratchet operational capacity, ***following up with incremental additions to our sales force***, then additional increases in operational capacity, ***always taking us to the next level in our growth cycle***.  We work this way to balance each function of the organization so none is overloaded at any given time and, most important, we can maintain our exceptional quality standards and service levels for our customers.

42.     ***False Statement***:  During the July 30, 2009 call, Riccitelli went so far as to not only quantify to the market but also even increase the incremental level of increased revenue attributable to the addition of each additional sales representative:

Based on what we've seen in recent quarters, we believe a range of around ***$2.5 million in annual revenue is a more accurate target per sales person and one that is ultimately achievable on a regular basis***.

Improvements in productivity and ***the addition of new sales representatives are helping to drive increases in case volumes***.

43.     **_False Statement_**:  Riccitelli ended his prepared remarks by confirming defendants were increasing FY09 guidance, as had been announced in the Company's press release:

> As we consider our performance through the end of 2009, we are revising our expectations to incorporate our second quarter operational results and our exceptional cash collections, a benefit that flows directly through to the bottom line.  **_We now expect revenues for the full-year 2009 of between $175 million and $180 million, up from our prior guidance of approximately $170 million to $175 million_**.

> Our growth is expected to result in net income of approximately $25 million for 2009, up from a prior estimate of $22 million . . . .  **_EPS is expected to be between $1.40 and $1.45 for the year, up from $1.20 to $1.25 as previously estimated_**, on an approximately 18.1 million shares outstanding.

44.     Analysts reacted positively to Genoptix's 2Q09 financial results and increased FY09 revenue and EPS guidance.  On July 31, 2009, for example, Caris & Company issued an analyst report covering Genoptix, that stated, in part:

> **_GXDX guided for 2009 sales of $175-$180 MM and EPS of $1.40-$1.45 which was a significant improvement over prior guidance_** of $170-$175 MM and EPS of $1.20-$1.25.

45.     On this positive news, the price of Genoptix stock increased $4.08 per share or 15% in one day, to close at $31.31 per share on July 31, 2009.  Defendants' statements on July 30, 2009, which were false and misleading when made, had a direct effect on Genoptix's stock price, which continued to trade at artificially inflated levels.

46.     Defendants' statements on July 30, 2009 regarding Genoptix's FY09 guidance and strong and increasing customer demand were materially false and misleading when made.  Defendants knew, but failed to disclose, the following:

(a)     As detailed in ¶¶136-164, throughout the Class Period, overall physician demand for Genoptix's testing services was decreasing, which significantly reduced the true impact of the Company adding additional sales representatives' "feet on the street" on revenues:

(i)     Defendants' statements attributing $2.5 million in annual revenue to each sales representative recruited by the Company as part of its growth strategy were misleading insofar as they provided the market with concrete quantification of the existing, strong demand that currently existed for the Company's core services and that was captured by each Genoptix sales representative;

1    (b)      As detailed in ¶¶137-138, 143(b), 147, 151, competition with a growing

2    number of in-network service providers, particularly as the market was becoming more saturated

3    with competitors, was having a unique and detrimental impact on Genoptix as an out-of-network

4    service provider throughout the Class Period;

5    (c)      As detailed in ¶¶140, 163, Genoptix's status as an out-of-network provider

6    was directly leading to decreased sales and thus revenue because throughout the Class Period, certain

7    physicians expressed frustration to Company sales representatives and stopped using Genoptix's

8    services altogether because patients were receiving EOB documents from their insurance company

9    that appeared to (but did not) hold them responsible for significant out-of-network fees;

10   (d)      As detailed in ¶¶139, 141, 152, 159, throughout the Class Period, Genoptix's

11   physician customers were closing their private practices for economic reasons and going to work for

12   hospitals.  This trend had a severe, negative impact on sales and corresponding revenue because

13   hospitals were primarily in-network and used in-network and/or in-house diagnostic testing service

14   providers instead of Genoptix, and Company management was unwilling to implement a plan that

15   would effectively expand the business into the hospital market.  *Id.*; and

16   (e)      As detailed in ¶¶145, 148-149, by the start of the Class Period, defendants

17   knew Genoptix would be losing its largest account, Georgia Cancer Center, which accounted for

18   between $15 million to $20 million in annual revenue during FY09, as a direct result of defendants'

19   refusal to enter into a client-billing arrangement despite Georgia Cancer Center's strenuous requests.

20   During 2009 and 2010, other customers were also lost as a result of defendants' refusal to enter into

21   client-billing relationships where such arrangements were permitted.

22   47.    Based on decreasing customer demand and corresponding negative sales trends

23   known to defendants but not to the investing public, defendants had no reasonable basis upon which

24   to issue the FY09 guidance they provided to the market on July 30, 2009.

25   48.    Defendants' July 30, 2009 false and misleading statements concerning FY09

26   guidance were not protected by the PSLRA's safe harbor because they were not accompanied by

27   cautionary language that was substantive and tailored to the specific risks involved and/or that fully

28   disclosed existing adverse risks.  And although defendants' July 30, 2009 false and misleading

statements related to strong customer demand were statements of current fact, even assuming *arguendo* they were not, these statements also would not be afforded safe harbor protection for these same reasons:

(a)     Defendants' false and misleading statements that failed to disclose decreasing customer demand due to Genoptix's status as an out-of-network health care services provider, including their failure to disclose to their primary customers, private physicians were moving to hospitals are not adequately addressed by defendants' risk disclosures and therefore are not insulated from liability by the PSLRA's safe harbor.  The *only* potentially negative consequence of the Company operating as an out-of-network provider mentioned in its purported warnings concerns potential reimbursement problems and situations where Genoptix is prohibited from accepting in-network fees, causing patients to face increased fees – which are *not* a part of plaintiffs' allegations in this case.  This language, therefore, is both not tailored enough to invoke the safe harbor and quite simply, irrelevant;

(b)     Defendants' false and misleading statements that failed to disclose decreasing customer demand due to increasing competition, particularly by in-network health care services providers are not adequately addressed by defendants' risk disclosures and therefore are not insulated from liability by the PSLRA's safe harbor.  The Company's purported warnings concerning competition spoke only generally about how a competitive landscape could affect its financial results.  This language was not tailored to the risk involved and thus not meaningful, as Genoptix failed to warn investors of the known, unique and detrimental impact that exponentially increasing competition and market saturation with niche competitors was having on the Company as an out-of-network health care services provider; and

(c)     Defendants' false and misleading statements concerning revenue and income guidance for Genoptix are not adequately addressed by defendants' risk disclosures and therefore are not insulated from liability by the PSLRA's safe harbor.  The Company's purported warnings

concerning continued growth consisted of vague, boilerplate language, including statements that losses may result if previous decline and expenses could not be controlled, that Genoptix had a limited operating history, and that its growth rate may decline.  These disclosures **did not** address with any specificity the underlying, adverse facts known by defendants to already be in existence at Genoptix (discussed in subparagraphs (a) and (b) above) that eliminated any reasonable basis upon which to issue the Class Period guidance defendants provided to the market.

49.     Defendants' statements on July 30, 2009, which were false and misleading when made, had direct effect on Genoptix's price, which continued to trade at artificially inflated levels.

50.     **_False Statement_**:  On September 21, 2009, Riccitelli made a presentation at the Bank of America Securities Mid Cap Conference, wherein he reiterated the Company's increased guidance:

> **_We also were able to increase our guidance in the most recent earnings call_**.  **_We are now forecasting $175 million to $180 million for the full year 2009_**. That will be a 53% year-on-year growth.  **_Our GAAP EPS estimates are now in the range of $1.40 to $1.45 for the full year 2009_**.

51.     **_False Statement_**:  During the September 21, 2009 conference, Riccitelli further described the Company's growth strategy, with a particular emphasis on adding sales representatives to capture existing strong demand:

> Our growth strategy is, in many ways, very simple to state.  It is pretty much keep doing what we are doing.  We have a lot of organic growth ahead of us.  We have, as I said, 61 reps.  **_We think that sales organization is about 50% built out_**. We have a long way to go.  Our general view is to build capacity in then **_add demand by adding more sales representatives to speak to more community hematologists more frequently, deepening that geographic footprint_**.

52.     **_False Statement_**:  Importantly, during the September 21, 2009 conference, Riccitelli specifically assured Genoptix's position as an out-of-network health care services provider was a hindrance to its financial performance, and that patients did **_not_** face negative consequences for their physician choosing to utilize Genoptix's services:

> We are reimbursed then from payors on an out-of-network basis, but **_we never penalize a patient for their caregiver having chosen an out-of-network provider, namely Genoptix_**.

> *       *       *

So we accept their in network allowable deductibles and coinsurance.  We don't necessarily have to go after their out-of-network differences.  *So the patient never feels a penalty for their physician choosing us*.  *They never go back screaming at their physician, why did you choose this out-of-network provider?* . . . Thereby, *we are able to operate very effectively in this 50-50 contracted environment*.

53.     During the September 21, 2009 conference, a member of the analyst community asked Riccitelli about the retention rate of physician customers:

*Kind of once you land them, then you get them and you keep them?* Do you have any type of renewal or – *do you lose docs* where they are sending you tests for while and then you don't get them anymore?

Riccitelli responded:

Yes, that is a great question, and *something we measure probably 1000 different ways in our company*.  But things that we share openly and publicly are a couple of variables.  One, as I said, we expect between 4.5 and 5 cases per client per month.  We average a little over 3.  So, if you take our entire population of all people, we're getting about 75% same-store sales.

*             *             *

*The other metric that we report on is the number of clients that are ordering in the most recent 30 days*.

*             *             *

It is our view in our marketplace that we lead with our hematomalignancy service.  *That is our bread and butter*.

54.     **_False Statement_**:  The next day, Riccitelli gave another presentation discussing Genoptix's continued growth at the September 22, 2009 UBS Global Life Sciences Conference.  He reiterated to the investment community audience the messages he had given conference attendees the previous day, specifically noting **_demand for Company services exceeded the supply of available sales representatives_** to capture it and turn it into increased revenues:

**_We increased our guidance recently to achieve $175 million to $180 million at the top line here for 2009_**.  That will be 53% year-on-year growth.  **_Our EPS targets this year are $1.40 to $1.45_**.

*             *             *

Our growth strategy is, in many ways, relatively simple.  To state, it's keep doing what we're doing.  As we said, we think we have the legs to double to triple the size of our market share here in the next three to five years.  We will do that by continuing to add capacity, starting with hematopathologists, and then adding demand, and then adding more capacity and then **_adding more demand in the form_**

*of hiring more sales representatives* – so deepening our geographic footprint in the marketplace.

\* \* \*

We think of *our sales organization as this very large pipe* that we've built into that marketplace. *We still only have a trickle of products going through it, and that represents a large growth opportunity unto itself*, in our view.

55. **<u>False Statement</u>**:  During the September 22, 2009 conference, Riccitelli again assured analysts and investors that patients were **not** being negatively affected by Genoptix operating as an out-of-network provider, and therefore this was **not** causing doctors to use competitors instead:

So a lot of the time, half the time, we are not in-network. *So how do we achieve business, being out of network?  Well, it's relatively simple*.  At the end of the day, a physician cannot be told what care decisions are required for their patients; it's up to them. . . .

Now on the other side, on the backside, *we can't penalize them [the Company's physician customers] for choosing an out of network provider, and we especially can't penalize the patient*.

So we are perfectly happy, and we have the sophistication in our billing systems to understand a patient's healthcare policy and insurance policy and what the differences are between in-network and out of network fee schedules.  We are perfectly happy to accept their in-network allowable deductibles or coinsurance, and that's what we do.  So therefore, *a patient never runs back into their physician saying, "Why did you send this out of network?*  You cost me a fortune.  I wish you hadn't done that."  That can happen and we never let it happen.

56. **<u>False Statement</u>**:   In concluding his presentation at the September 22, 2009 conference, Riccitelli reiterated Genoptix's increased guidance and again emphasized the growth of the Company's sales force was a primary factor in continuing to achieve record growth:

So one last slide – a little bit more color on our guidance for 2009.  I spoke a bit about this.  *Our topline target right now that we think we will achieve is somewhere between $175 million and $180 million*.  That represents 53% year-on-year growth. . . .

*The net income target is $25 million or $1.40 to $1.45 EPS*.

\* \* \*

From a longer-term perspective – I touched on much of this – *we anticipate doubling to tripling the size of our market share by continuing to grow our sales organization* and our lab capacity to meet that demand that we will create – 120 sales reps or so within two to three years.

57. On November 5, 2009, Genoptix issued a press release announcing its 3Q09 financial results, that stated, in part, the Company

reported revenues of $50.8 million for the third quarter of 2009, which increased 58% over revenue of $32.1 million for the comparable period in 2008 . . . .

\*       \*       \*

Net income was $9.5 million for the third quarter of 2009, or $0.53 diluted earnings per share (EPS), based on 18.0 million weighted average common shares outstanding and a tax rate of 43%.

58.    ***False Statement***:   Defendants provided the following ***increased*** FY09 and preliminary FY10 guidance to investors in Genoptix's November 5, 2009 press release:

Recognizing the strength of our collection efforts and financial results in the third quarter, ***Genoptix expects revenues for the full-year 2009 of approximately $180 million*** with full-year gross margins of approximately 60%.

\*       \*       \*

***For 2010, revenues are expected to grow to approximately $235 million***. The Company intends to provide more detailed guidance in February when reporting results for the fourth quarter and full-year 2009.

59.    ***False Statement(s)***:  On November 5, 2009, Genoptix hosted a conference call with the investment community to discuss the Company's 3Q09 financial results.   The Individual Defendants participated in the call and had an opportunity to address analysts' and investors' questions and concerns, and correct any inaccurate information or misleading statements.  During the call, Nova told the market, without discussing increasing physician dissatisfaction with Genoptix's billing as an out-of-network provider and trends reflecting decreasing doctor demand:

***Ultimately, the satisfaction of our physician customers and demand for our services are the key drivers to our success***.

60.    ***False Statement(s)***:  Riccitelli again attributed revenue figures to each additional sales representative during Genoptix's November 5, 2009 conference call:

Once again our physicians and laboratory professionals met the challenge of managing the increasing number of cases brought in by our growing sales team.

\*       \*       \*

***We continue to believe that an average of $2.5 million in annual revenue is an appropriate expectation for productivity per salesperson and one that is achievable on a regular basis***.

61. **_False Statement(s)_**:  In concluding his prepared remarks during the November 5, 2009 conference call, Riccitelli reiterated the **_increased_** guidance issued that day in the Company press release:

> Now, as we consider our performance through the end of 2009, we are revising our expectations to incorporate our third quarter operational results and our exceptional cash collections during the year, as well as the decreased activity associated with the upcoming holidays.  Taking the seasonal reduction of patient visits into account, **_we now expect revenues for the full year 2009 of approximately $180 million, at the top of the previously provided range of $175 million to $180 million_**.
>
> **_Our growth is expected to result in net income of approximately $29 million for 2009_**, up from a prior estimate of $25 million . . . .  We are also **_raising our EPS guidance for the year to approximately $1.60_**, up from our prior estimate of between $1.40 and $1.45 on approximately 18 million shares outstanding. . . .
>
> . . . For 2010, we currently expect revenues of approximately $235 million.  We intend to provide more detailed guidance in February when reporting results for the fourth quarter and full year 2009.

62. **_False Statement(s)_**:  During the November 5, 2009 conference call, Schuling discussed Genoptix's reported decline in growth quarter over quarter, blaming innocuous factors while concealing the actual decline in end user demand known to Company management at that time:

> Well, as far as when you look at the Q2 to Q3 case volume is up around 4%, and much of that, as far as if you look at previous quarter growth, quarter over quarter, **_certainly we've had stronger quarter over quarter_**.  But for this particular quarter, being the third quarter, it is impacted by the summer months, the vacations.  And this is the same phenomena that we saw last year, almost precisely.  **_And so we're not concerned about it at all.  It's consistent with what we saw last year_**, and, as I think was mentioned earlier, we feel very strong about the sales hires that are coming in, and relating to fourth quarter we are hitting on all cylinders . . . .

63. On November 5, 2009, Genoptix filed a Form 10-Q with the SEC setting forth its 3Q09 financial results.  The Form 10-Q was accompanied by SOX certifications signed by Nova and Schuling substantially identical to the certifications quoted herein at ¶193.  The Form 10-Q reiterated that adding additional sales representatives to capture existing strong demand and thus incrementally increasing revenue was to credit for the Company's financial results:

> **_[M]anagement is focused upon expanding our sales organization as the primary driver for our continued growth_** while maintaining our existing hem/onc customer relationships.

*          *          *

Case volumes, and therefore revenues, have increased during the three and nine months ended September 30, 2009, *primarily as a result of a 29% increase in our field sales representatives* from 52 at September 30, 2008 to 67 at September 30, 2009.

64.     Genoptix's November 5, 2009 Form 10-Q also provided further detail as to the sales metrics consistently tracked by defendants:

Our management tracks and measures the general buying patterns of our hem/onc customers (including cases per month, revenues and cost of revenues per case and turn-around-time per case) and is focused on adding additional sales management and sales representatives in key markets to enhance our penetration in those markets.

65.     Analysts reacted positively to Genoptix's 3Q09 financial results and increased guidance.  A November 6, 2009 William Blair & Company report, for example, stated in part:

- Third-quarter EPS of $0.53 easily beat our estimate by 18 cents and consensus by 19 cents; management also raised its revenue guidance to the top end of its prior range $175 million to $180 million and increased 2009 EPS guidance expectations by 15 to 20 cents to $1.60.

- As a result, we are increasing our 2009 EPS estimate by 22 cents, to $1.70 . . . and our 2010 EPS estimate by 28 cents to $2.03 . . . .

66.     A November 6, 2009 SunTrust Robinson Humphrey Capital Markets analyst report recognized that defendants had explicitly touted the direct correlation between adding more sales representatives and necessarily increasing revenues by capturing existing strong demand:

GXDX resumed hiring in 3Q, bringing on five sales reps and eight hempaths – and now has 67 sales reps and 34 hempaths.  The company continues to target 85 sales reps by year end . . . . *Overall, the company anticipates each sales rep should produce $2.5MM in annual revenue*.

67.     Defendants' statements on September 21, September 22 and November 5, 2009 regarding Genoptix's increased FY09 and FY10 guidance, strong and increasing customer demand, the impact of operating as an in-network service provider and physician and patient satisfaction with Genoptix's services were materially false and misleading when made.  Defendants knew, but failed to disclose, the following:

(a)     As detailed in ¶¶136-164, throughout the Class Period, overall physician demand for Genoptix's testing services was decreasing, which significantly reduced the true impact of the Company adding additional sales representatives' "feet on the street" on revenues:

1         (i)     Defendants' statements attributing $2.5 million in annual revenue to
2 each sales representative recruited by the Company as part of its growth strategy were misleading
3 insofar as they provided the market with concrete quantification of the existing, strong demand that
4 currently existed for the Company's core services and that was captured by each Genoptix sales
5 representative;

6       (b)    As detailed in ¶¶137-138, 143(b), 147, 151, competition with a growing
7 number of in-network service providers, particularly as the market was becoming more saturated
8 with competitors, was having a unique and detrimental impact on Genoptix as a major out-of-
9 network service provider throughout the Class Period;

10      (c)    As detailed in ¶¶140, 163, Genoptix's status as an out-of-network provider
11 was directly leading to decreased sales and thus revenues because throughout the Class Period,
12 certain physicians expressed frustration to Company sales representatives and stopped using
13 Genoptix's services altogether because patients were receiving EOB documents from their insurance
14 company that appeared to (but did not) hold them responsible for significant out-of-network fees,
15 and certain customers stopped using Genoptix's diagnostic testing services due to this problem;

16      (d)    As detailed in ¶¶139, 141, 152, 159, throughout the Class Period, Genoptix's
17 physician customers were closing their private practices for economic reasons and going to work for
18 hospitals. This trend had a severe, negative impact on sales and corresponding revenue because
19 hospitals were primarily in-network and used in-network and/or in-house diagnostic testing service
20 providers instead of Genoptix, and Company management was unwilling to implement a plan that
21 would effectively expand the business into the hospital market. *Id.*; and

22      (e)    As detailed in ¶¶145, 148-149, by the start of the Class Period, defendants
23 knew Genoptix would be losing its largest account, Georgia Cancer Center, which accounted for
24 between $15 million to $20 million in annual revenue during FY09, as a direct result of defendants'
25 refusal to enter into a client-billing arrangement despite the Georgia Cancer Center's strenuous
26 requests. During 2009 and 2010, other customers were also lost as a result of defendants' refusal to
27 enter into client-billing relationships where such arrangements were permitted.

28

68.     Based on decreasing customer demand and corresponding negative sales trends known to defendants but not to the investing public, defendants had no reasonable basis upon which to issue the FY09 and FY10 guidance they provided to the market in September and November 2009.

69.     As discussed in detail *supra* at ¶48, defendants' September and November 2009 false and misleading statements concerning FY09 and FY10 guidance were not protected by the PSLRA's safe harbor because they were not accompanied by cautionary language that was substantive and tailored to the specific risks involved and/or that fully disclosed existing adverse risks.   And although defendants' September and November 2009 false and misleading statements related to strong customer demand were statements of current fact, even assuming ***arguendo*** they were not, these statements also would not be afforded safe harbor protection for these same reasons.

70.     Defendants' statements on September 21, September 22 and November 5, 2009, which were false and misleading when made, had a direct effect on Genoptix's stock price, which continued to trade at artificially inflated levels.

71.     On January 25, 2010, Schuling gave a presentation discussing Genoptix to the investment community at the Jefferies Global Healthcare Services Conference, during which he assured the market defendants tracked detailed metrics that ultimately translated into the Company's financial results:

> On the operations side, again, **we are a very metric-driven organization. Accountability at all levels. Everything is shared with management and all the way down through the organization**.

72.     ***False Statement***:   During the January 25, 2010 conference, Schuling echoed Riccitelli's September 21 and 22, 2009 comments about Genoptix's out-of-network position ***not*** hindering patient satisfaction and thus revenue streams:

> **We treat our patients and our Hem/Oncs in a friendly billing approach**.  We only bill for in-network coinsurance and deductibles.

73.     ***False Statement***:   Schuling concluded his January 25, 2010 presentation by stating:

> Our performance outlook, probably wouldn't be prudent to talk too much about 2009 since we are on the cusp of announcing our full-year earnings on February 25.  But suffice it to say that we've been very, very pleased with our

financial performance through the third quarter of 2009, and we look forward to sharing our total-year results with each of you on February 25, 2010.

We did give a little bit of indication on 2010 with some preliminary guidance of $235 million.

74.     On February 25, 2010, Genoptix issued a press release announcing its 4Q09 and FY09 financial results, that stated, in part:

Genoptix, Inc. . . . today reported revenues of $49.1 million and $184.4 million for the fourth quarter and full year of 2009, respectively.  Net income was $7.4 million, or $0.41 per diluted share, and $30.6 million, or $1.71 per diluted share, for the fourth quarter and full year 2009, respectively.

75.     ***False Statement***:  Nova was quoted in Genoptix's February 25, 2010 press release as touting a continued growth in physician demand:

"We managed nearly 57,000 patient cases throughout the year, an increase of approximately 48% from the number of cases managed in 2008, ***a trend indicative of the demand*** for personalized service on the part of the community physicians we serve . . . ."

76.     ***False Statement***:  Genoptix's February 25, 2010 press release concluded with an increase in revenue guidance:

Recognizing the strength of operations, ***Genoptix expects revenues for the full-year 2010 to be between $235 and $240 million, up from initial guidance of $235 million***, with full-year gross margins in the high-fiftieth percentile.

77.     ***False Statement***:  On February 25, 2010, Genoptix hosted a conference call with the investment community to discuss the Company's 4Q09 and FY09 financial results.  The Individual Defendants participated in the call and had an opportunity to address analysts' and investors' questions and concerns, and correct any inaccurate information or misleading statements.  During the call, Nova again misleadingly touted that increasing customer demand prompted an increase in Company guidance for FY10 and that customer satisfaction drove this demand:

We finished 2009 with growth in case volumes and revenues while income from operations more than doubled.  During the fourth quarter, we managed more than 15,000 patient cases, up 34% from a year ago, despite the seasonality typically associated with the extended year end holiday season.

That takes our case total count for all of 2009 to nearly 57,000, an increase of 48% from approximately 39,000 patient cases managed during the same period in 2008, ***a trend indicative of the demand*** for personalized service on the part of the community physicians we serve.  As a result of this increased volume, our annual revenues were up 59% to $184.4 million for 2009, beating our previous expectations of approximately $180 million for the year.  These revenues reflect the ***continued***

*strong demand* for our high-quality service as well as the successful collection of revenues associated with services provided in past periods.

\*       \*       \*

Earlier today we announced a three-year participating provider agreement with Aetna effective April 1st, 2010, our first national contract with a major commercial payer.

\*       \*       \*

Ultimately, *the satisfaction of our physician customers and demand for our services are the key drivers of our success*. . . .

In consideration of our growth initiatives and the relationships we are building, *we expect revenues for the full year 2010 of between $235 million and $240 million, up from our initial guidance of approximately $235 million*.

78.   **_False Statement_**:  During the February 25, 2010 conference call, Riccitelli further described the Company's continued growth based on increasing demand and the value inherent to each sales representative because of that existing demand:

We must expand operationally to meet the requirements of the *growing demand for our core offerings*, as well as any additional testing modalities we may add.  For the foreseeable future, we intend to continue to grow by increasing our personnel as well as expanding our facility and information systems infrastructure.

\*       \*       \*

Our sales team also continues to grow.  During the fourth quarter, we hired additional field sales representatives, bringing our total to 80 by the end of 2009. This trend is expected to continue as we move through the year, particularly as we add new services which may require us to deepen our coverage. Currently, it is our goal to end 2010 with approximately 100 field sales representatives on staff.

*We continue to believe that an average of $2.5 million in annual revenue is an appropriate expectation for productivity per sales person and one that is achievable on a regular basis*.

79.   During the February 25, 2010 conference call, Bank of America analyst Robert Willoughby asked the defendants:

*[T]he boost to revenue guidance*, I mean are we looking at Aetna as the primary driver of that or is it just sales force expansion, everybody contributing a little bit more?

**_False Statement_**:  In reply, Schuling told the market that they increased Genoptix's guidance because defendants actually had a better picture of true market demand for FY10 than they had months prior:

*It was really a matter getting closer to 2010. When we gave the original guidance, that was several months ago and we gained clarity as we've reached today* and certainly felt good with our performance in the fourth quarter despite the seasonality and a little bit of the weather issue that hampered I think everyone in the fourth quarter. *And so really was just having more clarity.* And we do feel good about the sales organization and who we have in place there and the coverage that we have.

80.     During the February 25, 2010 conference call, analysts again requested additional detail concerning the Company's sales force because defendants had consistently stated that metric directly related to Genoptix's financial condition. Stephens Inc. analyst Scott Gleason asked:

I was wondering Tina, Doug and Sam, if you could first go through and just maybe tell us kind of *what your guidance for the year implies in terms of sales force growth and also in terms of hempath growth*, towards the end of the year?

Riccitelli responded:

For sales force growth, sales force growth we ended the fourth quarter '09 with 80 field representatives. These are people that actually call on customers. These are our feet on the street. And we anticipate growing that to 100 people calling on customers, feet on the street, by year end 2010.

81.     During the February 25, 2010 conference call, Wedbush Securities analyst Zarak Khurshid asked:

Can you just maybe talk a little bit about the – sort of the *general macroeconomic environment* and sort of the employment effect?

*False Statement*:   Schuling responded, minimizing the impact of the economy on Genoptix's business model and concealing its detrimental impact on the Company's customer base:

[W]e felt pretty good about the fourth quarter, to be honest with you. And more specifically I guess overall economic situation, I would remind you again is I don't want to say that we're not feeling any of the impacts of it, but generally speaking again *our customers are those community-based hematologists, oncologists. We're not readily and frequently calling on hospitals.* Our specimens come from the community centers. *And so we're not as exposed to indigent type of situation as perhaps as other laboratories may be*.

82.     On February 25, 2010, Genoptix filed a Form 10-K with the SEC setting forth its 4Q09 and FY09 financial results. The Form 10-K was accompanied by SOX certifications signed by Nova and Schuling substantially identical to the certifications quoted herein at ¶193. The Form 10-K set forth in detail the numerous internal metrics reflecting actual physician demand that were continuously examined by Company management, including the defendants:

Experienced Management Team and Metric Driven Culture

. . . Our management team has created a culture of accountability throughout the organization in which we track the performance of our services real time and use our extensive internal systems and processes to continuously measure the performance of our business operations.  For example, we track and measure the daily average speed for answering calls, the percentage of calls answered live, the average turn around time for each of our services and general customer buying patterns, including cases per month, frequency of orders and tests per case.  We believe that our metric driven culture results in higher quality services, increased customer satisfaction and improved productivity.

\*       \*       \*

***Our management tracks and measures the general buying patterns of our hem/onc customers (including cases per month, revenues and cost of revenues per case and turn-around-time per case***) and is focused on adding additional sales management and sales representatives in key markets to enhance our penetration in those markets.

83.     ***False Statement***:   Consistent with defendants' previous messages, Genoptix's February 25, 2010 Form 10-K primarily attributed revenue results to Genoptix's hiring of sales representatives:

[M]anagement is focused upon ***expanding our sales organization as the primary driver for our continued growth*** while maintaining our existing hem/onc customer relationships.

\*       \*       \*

***Case volumes increased primarily as a result of the 46% increase in the number of our field sales representatives*** from 55 as of December 31, 2008 to 80 as of December 31, 2009. Similarly, the number of field sales representatives increased 62% for the year ended December 31, 2008 over 2007.  These increases in the number of our field sales representatives have enabled us to penetrate more accounts over a wider geographic area, increase our customer base and further focus our field sales representatives on in-person customer visits.

84.     Defendants' statements on January 25 and February 25, 2010 regarding the impact of Genoptix being an out-of-network provider, strong and increasing customer demand, patient billing, the effects of increasing competition and increased FY10 guidance were materially false and misleading when made.  Defendants knew, but failed to disclose, the following:

(a)     As detailed in ¶¶136-164, throughout the Class Period, overall physician demand for Genoptix's testing services was decreasing, which significantly reduced the true impact of the Company adding additional sales representatives' "feet on the street" on revenues:

(i)      Defendants' statements attributing $2.5 million in annual revenue to each sales representative recruited by the Company as part of its growth strategy were misleading insofar as they provided the market with concrete quantification of the existing, strong demand that currently existed for the Company's core services and that was captured by each Genoptix sales representative;

(b)      As detailed in ¶¶137-138, 143(b), 147, 151, competition with a growing number of in-network service providers, particularly as the market was becoming more saturated with competitors, was having a unique and detrimental impact on Genoptix as a major out-of-network service provider throughout the Class Period;

(c)      As detailed in ¶¶140, 163, Genoptix's status as an out-of-network provider was directly leading to decreased sales and thus revenue because throughout the Class Period, certain physicians expressed frustration to Company sales representatives and stopped using Genoptix's services altogether because patients were receiving EOB documents from their insurance company that appeared to (but did not) hold them responsible for significant out-of-network fees, and certain customers stopped using Genoptix's diagnostic testing services due to this problem;

(d)      As detailed in ¶¶139, 141, 152, 159, throughout the Class Period, and particularly by the beginning of 2010, Genoptix's physician  customers were closing their private practices for economic reasons and going to work for  hospitals.  This trend had a severe, negative impact on sales and corresponding revenue because hospitals were primarily in-network and used in-network and/or in-house diagnostic testing service providers instead of Genoptix, and Company management was unwilling to implement a plan that would effectively expand the business into the hospital market.  *Id.*; and

(e)      As detailed in ¶¶145, 148-149, as of at least February 2010, Genoptix had lost its largest account, Georgia Cancer Center, which had accounted for between $15 million to $20 million in annual revenue during 2009, as a direct result of defendants' refusal to enter into a client-billing arrangement despite Georgia Cancer Center's strenuous requests.

85.     Based on decreasing customer demand and corresponding negative sales trends known to defendants but not to the investing public, defendants had no reasonable basis upon which to issue the FY10 guidance they provided to the market in January and February 2010.

86.     As discussed in detail *supra* at ¶48, defendants' January and February 2010 false and misleading statements concerning FY10 guidance were not protected by the PSLRA's safe harbor because they were not accompanied by cautionary language that was substantive and tailored to the specific risks involved and/or that fully disclosed existing adverse risks.  And although defendants' January and February 2010 false and misleading statements related to strong customer demand were statements of current fact, even assuming ***arguendo*** they were not, these statements also would not be afforded safe harbor protection for these same reasons.

87.     Defendants' statements on January 25 and February 25, 2010, which were false and misleading when made, had a direct effect on Genoptix's stock price, which continued to trade at artificially inflated levels.

### THE MARKET BEGINS TO LEARN THE TRUTH

88.     On May 6, 2010, Genoptix issued a press release announcing its 1Q10 financial results, which were ***far below consensus estimates of diluted EPS of $0.41 and revenue of $53.3 million***.  The release stated, in part, that the Company

> reported revenue of $47.4 million for the first quarter of 2010.  Net income was $5.3 million, or $0.29 per diluted share for the first quarter of 2010.
>
> *          *          *
>
> Net income was $5.3 million for the first quarter of 2010, or $0.29 diluted earnings per share (EPS), based on 18.2 million weighted average common shares outstanding and a tax rate of 45%.

89.     **_False Statement_**:  In the May 6, 2010 press release, however, defendants affirmed the Company's FY10 guidance despite this significant miss to estimates:

> ***Genoptix is reaffirming the guidance provided on February 25th for the full-year 2010 with revenue expectations between $235 and $240 million, with full-year gross margins in the high-fiftieth percentile***.

90.     **_False Statements_**:  On May 6, 2010, Genoptix hosted a conference call with the investment community to discuss the Company's 1Q10 financial results.  The Individual Defendants

participated in the call and had an opportunity to address analysts' and investors' questions and concerns, and correct any inaccurate information or misleading statements.  During the call, Nova blamed Genoptix's quarters miss to a purportedly planned shift in existing sales personnel from revenue-generating field representatives to management positions and continued to tout customer satisfaction as driving sales:

> In addition to the many reps that were hired at the end of 2009, ***we recently promoted a number of talented salespeople to leadership positions in the first quarter of 2010*** to support our ongoing expansion.  As part of this process, we have also been actively recruiting additional sales representatives to backfill the positions left open by promotions and the repositioning of reps in key territories.

> \*       \*       \*

> ***Ultimately, the satisfaction of our physician customers and demand of our services are the key drivers of our success.***

Schuling further discussed defendants' misleading disclosure:

> On the expense lines – sales and marketing expense increased as a percentage of revenues on a year-over-year basis . . . .  This increase related primarily to the expansion of our sales team at the end of 2009 and a more recent promotion of new managers at the district level put in place to support our strategic growth initiatives. This increased expense is expected to drive revenue growth going forward, enabling us to reach our revenue targets for the future.

And Riccitelli added:

> We reported in February that 2009 ended with increased sales hiring, adding 13 new reps in the last quarter of that year, which was the largest quarterly addition of salespeople in our history.  With the increasing number of sales reps, it was necessary for us to reconfigure our sales team in the first quarter of 2010, in preparation for the next phase of our expansion.  This process had the net effect of reducing the number of field sales reps in the quarter from the 80 we started with to the 77 reported at the end of the first quarter.

> \*       \*       \*

> There's another subtlety to the management restructuring and sales reorganization that we did.  ***In the past, some of our managers still carried sales quota***.  The structure of the organization allowed that kind of phenomenon to occur. We're now at a scale and a size where ***that isn't the case anymore***.  And managers need to manage, and managers need to lead.  And they need to form the framework of the organization that then we can build around and add more feet on the street, that actually have quota, and will go out and speak to customers on a daily basis, and attract the business that we're used to attracting.

91.   <u>**False Statement**</u>:  Riccitelli discussed continued strong customer demand during the May 6, 2010 conference call despite Genoptix's disappointing 1Q10 financial results:

> ***We must expand operationally to meet the requirements of the growing demand for our core offerings*** . . . .

> Success in this industry depends on the consistent quality of our service, and development of high-touch relationships. Our efforts this year include filling gaps in our sales coverage, which is why a key part of our expansion plan is the growth of our sales and marketing organization. This continued investment will enable us to visit more Hem/Oncs more frequently, to educate and inform them about our service offerings while strengthening our competitive presence; all while deepening our existing relationships and maintaining our high standards of customer service.

> \*   \*   \*

> ***We continue to believe that approximately $2.5 million in annual revenue is an appropriate expectation for average productivity per salesperson, and one that is achievable on a regular basis***, though there is some expectation of additional opportunity for leverage as new members of our sales team mature in their positions and additional services are provided to each physician office, reducing the average cost per sale.

> \*   \*   \*

> ***We are reaffirming our revenue guidance for 2010 of between $235 million and $240 million*** and our net income expectation of approximately $33 million, assuming a tax rate of approximately 44%. ***EPS for the year is expected to be in the range of $1.80 to $1.85*** on approximately 18.3 million shares outstanding.

And Nova added:

> [W]e're now up to 82 sales reps, and we feel very good about that – 1,350, approximately, ordering physicians. ***We're definitely seeing some nice trends that we're very pleased with. And that's why we reaffirmed our guidance***.

92.    Genoptix's 1Q10 reported financial results missed consensus estimates by a wide margin (estimates of $53.3 million in revenue and $0.41 EPS versus $47.4 million in revenue and $0.29 EPS actually reported). According to Schuling, although defendants "don't give quarterly guidance," market estimates were made based on information provided to the public by the defendants and, as reflected in analyst reports, the market generally interpreted defendants' updates to quarterly estimates as essentially providing quarterly guidance. Regardless, analysts questioned defendants about their disappointing 1Q10 numbers and, most critically, the reaffirmation of FY10 guidance. Barclays Capital analyst Brendan Strong, for example, asked:

> Just, the last question, just maybe to put things in perspective – you guys did 21% growth in the first quarter, on the revenue line. ***To hit guidance, it looks like you need to do 29% to 33% growth for the next three quarters***. As you look at April – and I know it's only one month, but ***does that give you some good visibility into maybe being able to hit that range?*** Or is this a situation where revenue

growth, you think, is going to actually accelerate throughout the course of the year, maybe be stronger in the third quarter than it is in the second?

**_False Statement_**:  Schuling responded:

> *As you do the math to our guidance and where we're at in Q1, we obviously have high expectations for the rest of the year, and we aim to hit those*.

93.     During the May 6, 2010 conference call, analysts expressed concern about the unexpected "reconfiguration" of the sales department blamed by defendants as negatively impacting 1Q10 revenues.  For example, Avondale Partner analyst Kemp Dolliver asked defendants:

> A couple questions regarding the sales force changes – could you just walk through the changes you made in the context of – was there any sales force turnover in terms of departures?  Or are we looking at a case where you moved a handful or so of people from sales to sales management – you had to essentially backfill some of those markets?  Or is there also a case where you brought on a bunch of people in a short period of time; maybe a couple of them did not work out?

**_False Statement_**:  Nova responded "I think it's a combination of everything you said."

94.     During the May 6, 2010 conference call, Oppenheimer analyst Charles Rhyee again provided defendants with an explicit opportunity to correct any misstatements they had previously issued to the market:

> As we think about the ramp through the back half of the year, are you – *is it fair to think you're suggesting that we're going to have revenue growth accelerate through the end of the year?*  I know, Doug, you kind of alluded to that.  I just wanted to just be clear about it.

**_False Statement_**:  Yet Schuling again confirmed his previous false message and again attributed FY10 financial prospects on the number of sales representative, which each directly translated into incrementally increased revenues totaling as much as $2.5 million annually:

> *Absolutely, yes*.  You start with the first premise that we have a number of reps who've been with us for awhile, who have yet to hit their peak productivity.  And then we've got the 13.  We had a record hire at the end of Q4 of 13 reps that have now had four to six months of experience.  And they're going to also start hitting, or hitting closer to their peak numbers as well.
>
> *And as I did allude to earlier is that overall timeframe in which our average rep gets to that $2.5 million is reducing over time*.

95.     In response to the negative news disclosed by defendants during the May 6, 2010 conference call, Bank of America and Merrill Lynch analyst Robert Willoughby asked:

> I guess, with the stock indicating below 30, *the market's not sharing quite the level of enthusiasm for your growth prospects and the recent investments that you have*

*made. Isn't this sort of a cry to disclose a bit more here?* Can you give us something other than just warm fuzzies on how the Aetna contract is unfolding for you? Can this volume be meaningful in the current quarter, pricing holding up on that book of business? What more can you tell us about that?

*       *       *

*[Y]our systems are good enough, you would have the data on the volumes.* It's not something we have to wait two or three weeks forward to figure out what happened over the preceding two- or three-week period.

Riccitelli replied:

No. We know – this is Sam, Bob – *we know on a daily basis what's coming in from just about anywhere*.

Nova confirmed:

From everybody. Sure.

And Riccitelli again expressed "*[t]here's no lag in our metric*."

96. During the May 6, 2010 conference call, analyst Robert Willoughby expressed "frustration" with defendants leaving a build up of "cash on the balance sheet." He also commented: "*We've certainly seen the management insiders selling*." In reply, Schuling discussed the Company's cash, but *did not* address the analyst's comment recognizing significant Class Period insider selling by defendants.

97. During the May 6, 2010 conference call, Stephens, Inc. analyst Scott Gleason asked:

*Is there any kind of change that you guys have seen over the last kind of six months, in terms of the competitive environment* . . . ?

**False Statement**: Nova replied, omitting the material, competitive disadvantage Genoptix faced by virtue of it being an out-of-network provider:

Yes. There's no question that there are more companies out there . . . .

. . . But their approach is very different. They don't have the same infrastructure, they don't have the exact same business model. And we feel very strongly about what we're doing and what we'll continue to be doing.

98. **False Statement**: During the May 6, 2010 conference call, defendants continued to assure investors that Genoptix was well positioned to withstand competitive pressure based on its quality of diagnostic testing services – regardless of cost or other economic considerations – and that what was needed to minimize the market share loss to competitors was more sales reps. Riccitelli

1   similarly failed to disclose Genoptix's known competitive disadvantage due to its out-of-network

2   position:

> No other laboratory comes even close to the lab operational performance that we're able to do, the level of customer service that we're really able to provide.
>
> ***It's a matter of us getting our feet out on the streets***, to battle back on all of these copycats out there that are really pseudo-copycats. It's not the real deal.

6   99.   Analysts reacted negatively to Genoptix's 1Q10 disappointing financial results, yet

7   remained assured by defendants' misleading reaffirmation of FY10 guidance. William Blair &

8   Company, for example, issued a May 7, 2010 report that stated in part:

- Genoptix reported ***disappointing results*** after the close Thursday, with EPS of $0.29, ***which missed our estimate by $0.18 and consensus by $0.13. Despite the miss, management reaffirmed 2010 revenue guidance of $235 million-$240 million and EPS guidance of $1.80-$1.85.***

- The miss relative to our estimate was primarily driven by lower case volume than expected (growth of 16% versus our 33% target), lower contractual adjustments ($1 million versus our $1.5 million target) . . . .

- The company made some planned adjustments to its salesforce, promoting sales representatives to management; as a result, ***management cited fewer "feet on the street" in the quarter as the primary driver behind the sequential flattening revenues***, which was compounded by inclement weather and perhaps, to a lesser extent, the economic backdrop.

17   Although the report confirmed "***[m]anagement cited a planned adjustment to its salesforce as the***

18   ***primary driver of the weaker-than-expected volumes***," the investing public had not been warned of

19   this "adjustment."

20   100.   As such, it came as no surprise that on May 7, 2010, Oppenheimer reported, in part:

> ***EPS for 1Q of $0.29 was well below consensus of $0.41, driven by significantly lower than expected revenue of $47.4M (vs. consensus of $53.3M)***. Weather certainly had an impact, but the promotion of several sales reps from quota to non-quota status seems to have had the biggest impact to revenues (we estimate $2-3M). ***In our view, this shift could have been better signaled, which would have prepared the market for these results***.

25   101.   ***False Statement***: On May 6, 2010, Genoptix also filed a Form 10-Q with the SEC

26   setting forth its 1Q10 financial results. The Form 10-Q was accompanied by SOX certifications

27   signed by Nova and Schuling substantially identical to the certifications quoted herein at ¶193. The

28   Form 10-Q reported:

*[M]anagement is focused upon expanding our sales organization as the primary driver for our continued growth* while maintaining our existing hem/onc customer relationships.

*     *     *

*Case volumes, and therefore revenues*, increased during the three months ended March 31, 2010, *primarily as a result of a 24% increase in our field sales representatives* from 62 at March 31, 2009 to 77 at March 31, 2010.

102.    The Company's May 6, 2010 Form 10-Q also confirmed:

*Our management tracks and measures the general buying patterns of our hem/onc customers (including cases per month, revenues and cost of revenues per case and turn-around-time per case)* and is focused on adding additional sales management and sales representatives in key markets to enhance our penetration in those markets.

103.    **_False Statement_**:  Genoptix's Form 10-Q filed on May 6, 2010 also discussed the partial disclosure that had been announced by defendants that day:

During the three months ended March 31, 2010, *we experienced some downward pressure on case volume due to these transitions in our sales organization. The net affect of these transitions temporarily resulted in fewer field sales representatives* being productively engaged in customer visits.

104.    Despite their partial disclosure on May 6, 2010, defendants' statements on May 6, 2010 regarding Genoptix's strong and increasing customer demand, the impact of an increasingly competitive environment, the reasons prompting a decrease in revenue during 1Q09 and the pervasiveness of those reasons, and the Company's FY10 guidance were materially false and misleading when made.  Defendants knew, but failed to disclose, the following:

(a)    As detailed in ¶¶136-164, throughout the Class Period, overall physician demand for Genoptix's testing services was decreasing, which significantly reduced the true impact of the Company adding additional sales representatives' "feet on the street" on revenues:

(i)    Defendants' statements attributing $2.5 million in annual revenue to each sales representative recruited by the Company as part of its growth strategy were misleading insofar as they provided the market with concrete quantification of the existing, strong demand that currently existed for the Company's core services and that was captured by each Genoptix sales representative;

(b)    As detailed in ¶¶137-138, 143(b), 147, 151, competition with a growing number of in-network service providers, particularly as the market was becoming more saturated

with competitors, was having a unique and detrimental impact on Genoptix as a major out-of-network service provider throughout the Class Period;

(c)     As detailed in ¶¶140, 163, Genoptix's status as an out-of-network provider was directly leading to decreased sales and thus revenue because throughout the Class Period, certain physicians expressed frustration to Company sales representatives and stopped using Genoptix services altogether because patients were receiving EOB documents from their insurance company that appeared to (but did not) hold them responsible for significant out-of-network fees, and certain customers stopped using Genoptix's diagnostic testing services due to this problem;

(d)     As detailed in ¶¶139, 141, 152, 159, throughout the Class Period, and particularly by the beginning of 2010, Genoptix's physician customers were closing their private practices for economic reasons and going to work for hospitals. This trend had a severe, negative impact on sales and corresponding revenue because hospitals were primarily in-network and used in-network and/or in-house diagnostic testing service providers instead of Genoptix, and Company management was unwilling to implement a plan that would effectively expand the business into the hospital market. *Id.*; and

(e)     As detailed in ¶¶145, 148-149, as of at least February 2010, Genoptix had lost its largest account, the Georgia Cancer Center, which had accounted for between $15 million to $20 million in annual revenue during 2009, as a direct result of defendants' refusal to enter into a client-billing arrangement despite the Georgia Cancer Center's strenuous requests.

105.    Based on decreasing customer demand and corresponding negative sales trends known to defendants but not to the investing public, defendants had no reasonable basis upon which to issue the FY10 guidance they provided to the market in May 2010.

106.    The decrease in case volumes and revenue announced by defendants in May 2010, which came as a surprise to investors, was not temporary or due solely to a pre-planned, one-time reconfiguration of the Company's sales department and some bad weather, and thus defendants knew they had no reasonable basis on which to affirm Genoptix's previously announced, aggressive guidance.

107.   Defendants' partial disclosure on May 6, 2010 caused Genoptix's stock to drop $8.37 per share to close at $27.89 per share on May 7, 2010, a one-day decline of over 23% on high trading volume.  The stock continued to trade at artificially inflated levels, however, due to defendants' continued misrepresentations, including their reaffirmation of FY10 guidance.

108.   ***False Statement***:  Just five days later, on May 11, 2010, Genoptix participated in the Bank of America Merrill Lynch Healthcare Conference.  During the conference, defendants Nova and Riccitelli gave a presentation to analysts and investors to discuss the Company's financial results and continued growth.  Nova and Riccitelli had an opportunity to address analysts' and investors' questions and concerns, and correct any inaccurate information or misleading statements.  During the conference, Nova confirmed the Company's previously reaffirmed guidance:

> We have a strong growth profile.  Our revenues were up approximately 30% full year 2009 to full year 2010.  And, again, our revenue outlook, ***our guidance is at $230 million to $240 million in revenue for 2010, up 30%***, and $1.80 to $1.85 EPS for the full year.

109.   During the May 11, 2010 conference, an analyst questioned defendants' previous knowledge of the 1Q10 case volume decline that was not disclosed to investors prior to May 6, 2010:

> Can you talk a little bit about your decision making process in terms of the timing for your sales force reorganization?  And as a follow-up to that, ***you didn't change any of your guidance for the full year so does that suggest that you were kind of expecting the weakness in Q1 from the sales force reorg?***

***False Statement***:  In response, Nova defended the Company's unchanged FY10 guidance as based on an affirmative review of internal information:

> ***[W]e went back and we did review whether we would stay with guidance are not.  It was our decision at this time that we feel very confident that we will be able to make guidance for the year***.

110.   ***False Statement***:  During the May 11, 2010 presentation, Riccitelli revisited the partial disclosure made by defendants on May 6, 2010:

> Obviously in the first quarter we went through a rather significant restructuring in our sales team.  We are on record saying we will have around 100 sale FTEs by the end of this year and we think notably that in order to really canvass this market we are going to need 120 to 130 sales reps.  We needed a management structure in order to support all of that and we went through a lot of that transition here in the first quarter.

It took a little longer and was a little more turmoil than we had expected.  We entered the first quarter with 80 sales reps and came out with 77 people calling on our customers.  That is the first time we had a downward trend in that regard and that is really what held us back a bit from a volume standpoint.

\* \* \*

*The first quarter this year was the first time we had a small setback primarily due to the sales rep and sales organization restructuring*.  And we had some weather impact obviously in the first quarter as well which impacted our growth.  *We think that is all behind us*.

111. *False Statement*:  During the May 11, 2010 presentation, an analyst asked, as analysts had asked on previous occasions during the Class Period, for more detail concerning retention trends for doctor customers: "***Do you guys have any data on doctors who use your services and if they continue to use them?  Do you ever lose hem/onc clients and is there one or two reasons why?***"  At that time during the May 11, 2010 conference, Nova and Riccitelli were given an explicit opportunity to provide accurate statements concerning declining doctor retention rates, but did not.  Rather, Riccitelli assured investors defendants carefully tracked sales metrics, such that the overall trends were compiled by Company management and reported to investors in an accurate summary and manner:

*The way we speak to that primarily is in this metric that Tina already touched on that is measured at the most recent 30 days how many physician customers ordered in that period of time*. . . .

So that is sort of an all-in number that encompasses much of what was in your question.  There are some physicians who take time off, who don't order from you for a while.  There are competitive battles that happen that we have to win back, *but by measuring it in the fashion that we are and reporting it in that way you can see the net effect of all of those things*.  Our installed customer base has been growing nicely so we are anticipating that to continue.

112.  Defendants' statements on May 11, 2010, reiterating negative news previously released on May 6, 2010 yet continuing to assure investors demand remained strong and FY10 guidance was proper, were known by defendants to be false and misleading when made for the same reasons set forth in ¶104, and had a direct effect on Genoptix's stock price, which continued to trade at artificially inflated levels.

113.  As discussed in detail *supra* at ¶48, defendants' May 2010 false and misleading statements concerning FY10 guidance were not protected by the PSLRA's safe harbor because they

were not accompanied by cautionary language that was substantive and tailored to the specific risks involved and/or that fully disclosed existing adverse risks.  And although defendants' May 2010 false and misleading statements related to strong customer demand were statements of current fact, even assuming *arguendo* they were not, these statements also would not be afforded safe harbor protection for these same reasons.

114.   On June 11, 2010, WedBush Securities, Inc. released an analyst report discussing Genoptix that stated, in part:

> • Stock continues to get punished after **management missed opportunity to trim guidance during 1Q10 call**.  The debate continues over whether structural issues (sales force promotions/realignment and weather) or fundamental problems (new competition and/or customer pushback) drove weakness.  As a reminder, GXDX had an impeccable record of growth and management of expectations until 1Q10 where they surprised the Street, missing expectations by $7 MM and roughly $0.12.  Shares of GXDX have declined roughly 13% over the last month versus a 2% increase in the BTK and S&P 500.

115.   Finally, on June 16, 2010, the last day of the Class Period and *just over a month after Genoptix unequivocally reaffirmed its full year FY10 guidance even in the fact of market skepticism*, the Company issued a press release dramatically cutting this same guidance.  The Company also announced its "first look" at 2Q10 financial results.  In Genoptix's June 16, 2010 press release, defendant Nova blamed the following for the reduction in FY10 guidance:

> "*[P]hysician practices are under intense economic pressure, which when combined with increased competitive presence in the market, is reducing our field sales productivity*. . . .  *Growth is expected to slow* as the market moves through the current transition."

Genoptix's June 16, 2010 press release further disclosed:

> *As a result of these developments [about which defendant Nova was quoted], Genoptix is revising full-year revenue guidance to approximately $210 million for 2010* . . . .  This revenue guidance for 2010 reflects 14% growth over total revenues for 2009, *an adjustment from our most recent revenue guidance of $235-240 million*. . . .  *EPS is expected to be approximately $1.20 for the full-year 2010* based upon 18.4 million diluted shares outstanding and an annual effective tax rate of approximately 46%.  This is *an adjustment from our previous EPS guidance of $1.80-1.85*.

116.　　On June 16, 2010, *RTT News (United States)* published an article reporting that Genoptix had downgraded its "earnings and revenue forecast for the second quarter, **which are below Wall Street view**. The **company also lowered its fiscal 2010 guidance**."

117.　　On June 16, 2010, *Dow Jones Factiva* reported Genoptix "**cut its 2010 forecast as it gave weaker-than-anticipated estimates for the second quarter** as the laboratory services provider sees business growing less than anticipated."

118.　　Later in the day, on June 16, 2010, the Company participated in the William Blair Growth Stock Conference, during which defendants Nova and Riccitelli made a presentation to the investment community. As part of the presentation, Nova disclosed:

> We've seen emerging trends in physician practices gaining momentum. We've seen competitive activity leading to market saturation and therefore a slowing rate of new customer acquisitions, and recent managed care tactics have been impacting some key accounts.
>
> **Therefore, the sales force productivity ramp has been slower than we had originally forecasted and as you know in this morning's press release we have changed our guidance for 2010 due to this current environment**.
>
> **The oncology practice management issues that we have been seeing are really what have caused this transition**. And practices are really getting squeezed as community oncologists are overworked and forced to manage margins. . . .
>
> **We see consolidating practices. We see some selling to hospitals or management companies**. We've seen some doctors talk about bringing lab services into their offices and we've seen some creative revenue sharing between labs and hem/onc, and also the stress of implementing EMRs by 2014.
>
> 　　　　　　*　　*　　*
>
> The one thing we have seen a tremendous amount of in the last few months specifically is a group of companies, small companies that want to be Genoptix's wannabes and have really filled the offices. **And in fact we hear our doctors saying to us, 10 other labs want our bone marrow business that's not something we saw last year**. And you're the third rep this week and it's only Tuesday that's been in the office looking for those bone marrow samples. So again, a big change in the marketplace with a lot of these small competitors over the last few months specifically.

119.　　During the June 16, 2010 conference call, Riccitelli finally recognized Genoptix was at a competitive disadvantage by virtue of being out-of-network:

> **Another way we are going to impact our top line is becoming more in-network**. We want contracts with all major players in the United States marketplace, but we want those contracts on appropriate terms and that's what we're busily working on every day, day in and day out.

1                                    *        *        *

2              ***As we eliminate our position out of network, we eliminate one major
   competitive weapon that's being used against us***.  Our competitors that are
3    contracted are partnering up with some managed care organizations to try to limit our
   growth in certain offices.  Legally they really don't have much leg to stand on
4    because the physician has absolute right to select a player like Genoptix that they
   believe that provides better care for their patient and that's what we are doing more
5    often than not. But it creates noise and it affects our sales force effectiveness.  We
   want to eliminate that.

6                                    *        *        *

7              So our full year guidance results as the following slide states.  Obviously,
8    ***different than we had been saying earlier on in the year but now we think this is
   more realistic*** and more reflective of what's happening in the marketplace, given the
9    work we've been doing here in the last several weeks.  So top line $210 million,
   around $22 million in net income approximately and approximately $1.20 of EPS at
10   an annualized tax rate of about 46%.

11                                   *        *        *

12             The early ***transformation occurring in the community oncologist*** market
   that we need to acknowledge, ***there's a tremendous economic squeeze on these
13   people***.

14             120.    Following the Class Period ending news, Genoptix's stock dropped $5.69 per share to

15   close at $17.19 per share on June 16, 2010, a one-day decline of 25% on high volume.

16             121.    Analysts reacted harshly to this Class Period ending news, with some even issuing

17   published reports reflecting their sentiment they had been misled by the defendants.

18             122.    A June 16, 2010 William Blair & Company report discussed defendants' significant

19   cut to guidance:

20        •    Before the markets opened Wednesday, Genoptix substantially reduced 2010
             guidance and provided a first look at second-quarter results; we are likely to
21            lower our 2010 EPS estimate by roughly $0.50 after the company presents at
             our conference, also Wednesday morning.
22

23        •    Second-quarter revenue is expected to be $50 million (versus our $55 million
             target) and EPS are expected to be $0.30 (versus our $0.41 target).
24

25        •    Full-year revenue is expected to be $210 million (relative to our $229 million
             target), down $25 million to $30 million from prior guidance; 2010 EPS are
26            expected to be $1.20, down $0.60 to $0.65 from prior guidance and relative
             to our estimate of $1.70; operating margin is expected to be in the high teens
27            (versus prior guidance of low to mid-20s).

28                                   *        *        *

- Lastly, last quarter management cited salesforce changes (promotion of high-producing reps to management) as the driver behind weaker volumes.

123.   SunTrust Robinson Humphrey Capital Markets reported on June 16, 2010:

- ***The company cited a decrease in field sales productivity tied to doc office pressures and increased competition***.  While GXDX continues to increase sales staff (12 sales reps added in 2Q – 89 total), ***revenue per rep looks to be lagging***.

124.   And then on June 18, 2010, just two days after the end of the Class Period, Wedbush Securities, Inc. issued a critical report that stated in part:

- ***Breathtakingly poor management of recent expectations questions management's credibility and visibility into the business***.  Only one month after the company's 1Q10 miss (where management reiterated 2010 guidance for $230-235 MM and EPS of $1.80-$1.85) GXDX lowered 2010 revenue guidance by $20 MM (~9%) and EPS guidance by $0.60 (~32%) to $1.20.

*          *          *

- Unclear what is driving rapid business deceleration.  ***We don't buy all of GXDX's explanations***.

125.   On July 29, 2010, Genoptix hosted its 2Q10 earnings conference with the investment community in which the Individual Defendants participated.  This was defendants' first opportunity to be questioned by analysts during a Company quarterly earnings conference call.  During the call, defendants were questioned about the potential for Genoptix to attempt to "enter[] the hospital market."  Finally disclosing what defendants had known but not revealed to the market during the Class Period, Nova stated:

> Yes, that's something that, as Doug [Schuling] mentioned a little bit earlier, we've been starting to look at.  We've got some pilot programs going on now.  And it's important because as we have mentioned previously, it's important for us to follow the samples. ***And because there's been some consolidation of physicians to hospitals and groups similar, we're trying to stay on top of that and make sure we follow the samples***.

126.   During the July 29, 2010 conference call, Schuling provided lower expectations for revenue per salesperson figures than defendants had boasted during the Class Period:

> [I]f you calculate kind of our averages on annualized revenue you'll see that longer term, we expect to get to about $2.3 million roughly to $2.5 million annualized revenue per rep. . . .  [B]ut that's how you got to think about a new rep coming on, $900,000 to $1.5 million in the first year, roughly.

127.     Genoptix's Form 10-Q filed with the SEC on July 29, 2010 provided additional insight into what was known to defendants but not disclosed to investors during the Class Period.  As part of Management's Discussion & Analysis, the Form 10-Q reported under a previously omitted heading of "Other Factors Affecting Testing Volumes":

> [O]ur business is primarily focused on community-based hem/onc customers and physician practices.  ***As a result, our lab testing volumes are also impacted by developments affecting these community-based hem/onc practices, including insourcing of diagnostic testing by physician practices, transitions to new business models that can adversely impact their utilization of out-of-network diagnostic laboratories, consolidation of community-based hem/onc practices, the closing, downsizing***, or other adverse impacts on community-based hem/onc practices . . . .

128.     The Company's July 29, 2010 Form 10-Q further reported:

> During the three and six months ended June 30, 2010, we experienced some downward pressure on case volume growth due to these personnel transitions in our sales organization.  In addition, during this same period our sales organization faced market and economic external issues, which had a negative impact on our case volume.  More specifically, ***case volumes were impacted by challenges experienced in our community-based hem/onc customer offices, economically impacted by the changing healthcare environment***, and other external factors, including a general decline in the frequency of physician office visits by patients in the United States, ***increased and more aggressive competition from competitors attempting to replicate our key service offerings, increased pressure from managed care organizations to use in-network diagnostic providers*** and transitions in community-based hem/onc practices that have resulted in some physicians performing laboratory testing in-house or otherwise engaging in practices that decrease demand for our diagnostic services.  The net effect of these internal and external factors resulted in fewer field sales representatives being productively engaged in customer visits and limited the number of opportunities for our field sales representatives.

129.     On September 21, 2010, Nova and Riccitelli gave a presentation discussing Genoptix to analysts and investors at the 2010 UBS Global Life Sciences Conference.  During the conference, they were forced to provide guidance based on volumes and customer demand more closely aligned to the true facts that existed and were known to defendants during the Class Period.  Nova stated:

> As some of you saw this morning in our announcement, we have announced that for the third quarter our case volumes and revenues are expected to be 5% to 10% below prior quarter 2Q '10.  ***In the third quarter, we saw some continued softening in volumes***, not in price, from our customers.

130.     During the September 21, 2010 conference, Nova confirmed what defendants had known to be a significant factor negatively impacting demand for Genoptix services during the Class Period, yet had not revealed to investors:

*Physicians are experimenting with new business models* because of these pressures.  *Some of them have sold to hospitals* or management companies.

131.   During the September 21, 2010 conference, Riccitelli revealed a decrease in the Company's market share and reiterated Genoptix was experiencing decreased sales and demand:

> Right now, *our market share on the bone marrow procedure front is around 6%.* . . .
>
> . . . *[W]e will be down from a volume perspective in Q3, primarily due to softness at the community oncologist's office in our view, about 5% to 10%.*

132.   On September 22, 2010, WedBush Securities, Inc. issued a report discussing Genoptix's 3Q10 financial results, wherein the analyst expressed what had become a growing concern among analysts and investors following defendants' May 6 and June 16, 2010 disclosures:

- Investor presentation outlines weaker 3Q10 volumes and revenues.  GXDX released its new slide deck yesterday, before the market open, at an investor conference in New York where the company detailed a 5%-10% sequential fall-off in case volumes and revenue.  *The specific cause of the weakness is not completely clear,* which was cited as being due to changing trends at the physician office level and increasing competitive noise which is slowing the rate of new customer wins.

> \*      \*      \*

*We are downgrading our rating due to our lack of confidence in management and challenges within the company's core business.*

133.   On November 4, 2010, during Genoptix's 3Q10 earnings conference call with analysts and investors in which the Individual Defendants participated, William Blair & Company analyst Amanda Murphy requested an update concerning the Company's entry into the important hospital market.  In response to the trend of doctors moving from private practice into a hospital setting that was known to defendants yet concealed from investors during the Class Period, Schuling confirmed during the call that Genoptix hired an individual to focus solely on hospital marketing, because:

> The hospital, as we've indicated before, we're inclined to look at it to the degree that from a market for standpoint, *I think we indicated back in June that one of the many market trends that we're seeing is in some cases our core community-based physician, some of them moved to the hospital* and are consolidating with other Hem-Oncs.  And certainly, to the degree that they moved to a hospital, we'd like to be able to continue to service them with our product and service offerings.

134.     Genoptix's Form 10-Q for the quarter ending September 30, 2010 and filed with the SEC on November 4, 2010 further disclosed:

> *[O]ur lab testing volumes are also impacted by developments affecting these community-based hem/onc practices, including insourcing of diagnostic testing by physician practices, transitions to new business models* that can adversely impact their utilization of out-of-network diagnostic laboratories, consolidation of community-based hem/onc practices, the closing, downsizing, or other adverse impacts on community-based hem/onc practices . . . .  In all, these market and economic trends, along with the previously mentioned competitive and industry challenges, *have impacted our successive quarterly results over the course of the prior 12 month period*.

135.     On January 24, 2011, Novartis AG announced that it had entered into a definitive agreement to acquire Genoptix.  Genoptix became an indirect subsidiary of Novartis AG on February 28, 2011.

## CONFIDENTIAL WITNESS ALLEGATIONS SUPPORTING FALSITY AND SCIENTER

136.     Confidential Witness ("CW")1 was employed as a Sales Specialist in the Kentucky area throughout the Class Period, from approximately October 2008 until October 2010.  CW1 reported to a District Manager, who in turn reported to a Regional Manager who oversaw sales of Genoptix services in the mid-Atlantic and mid-Southern states.  One senior Genoptix manager worked above this Regional Manager, who reported directly to defendant Nova during the Class Period.  During CW1's tenure at Genoptix, CW1 travelled to Company headquarters in Carlsbad, California, three to four times per year to participate in regional and national sales meetings.

137.     Although negative trends in demand and thus sales were impacting CW1's sales during 2009, these trends significantly worsened beginning in 2010 and continued to do so through the end of the Class Period.  As of at least April 2010, increased competition was negatively and severely impacting the sales of Genoptix services.  According to CW1, increased competition – particularly by smaller, local companies – led to an oversupply of testing services.  This "saturation" of the market "dilute[ed] the message" Genoptix attempted to convey regarding the high quality of its unique testing services.

(a)     These trends were evident to CW1 when physician customers began to report they were being approached by sales representatives from Genoptix's competitors multiple times in

the span of a week or even a day.  While two or three competitors would come to offer their services in between CW1's visits during 2009, beginning in 2010, doctors reported being approached by eight or ten competitor salespersons over the same period of time.

138.     Not only did the number of Genoptix competitors increase dramatically beginning at the outset of 2010, which threatened Genoptix's market share simply by increasing demand for similar services, but according to CW1, unlike Genoptix, many of the Company's competitors had established contractual relationships with managed care providers, serving as in-network service providers.

(a)     Health care providers of various services, including Genoptix, can become contracted with managed care providers to be "in-network," and if no such contractual relationship exists, a provider is "out-of-network."  According to CW1, physicians may select any service provider they choose, whether or not the provider is in-network, if the doctor deems the service medically necessary.  In that case a managed care provider is obligated to pay for the service.  CW1 confirmed the Genoptix sales force was trained to emphasize that the Company's services were superior to those offered by its competitors, so that the doctor would select Genoptix despite its status as an out-of-network provider.

139.     Prior to 2009, according to CW1, Genoptix did not feel it was necessary to contract with any managed care providers.  CW1 confirmed hospitals – a major source of potential testing business, particularly given physicians' exodus from private practice into a hospital setting typically had contractual relationships with managed care providers and thus favored in-network companies that provided the testing services offered by Genoptix.  According to CW1, it was easier for a smaller, more local lab to secure contractual relationships with managed care providers within a certain state.  Genoptix, on the other hand, operated nationally and would have to enter into individual contracts in each state in which they provided services.  As such, the Company resisted becoming a contracted, in-network service provider.

140.     According to CW1, however, there was a major problem associated with this approach, which prompted many of Genoptix's physician customers to stop purchasing the Company's services.  Even though typically a managed care provider eventually paid for Genoptix's

services when they had been deemed medically necessary by the doctor, patients would receive an EOB from the managed care provider that showed the patient was wholly responsible for the "enormous" cost of Genoptix's testing services.  Because the Company was an out-of-network health care provider, the managed care providers automatically generated this EOB – which was sent to patients – as Genoptix and the managed care providers were in the process of determining what the managed care provider would pay for the services.  Patients complained to their doctors about the anxiety and disruption this caused for them, and physicians explicitly informed Genoptix sales representatives that such an "extreme EOB" was the reason for discontinuing their use of the Company's testing services.

(a)     CW1 personally lost a large account with Commonwealth Cancer center – representing $100,000 a month in revenue – around early 2009 as a result of this EOB issue. Commonwealth Cancer stopped buying Genoptix services and started to employ a competitor, Genzyme.  Despite the loss of this customer, it was still factored into CW1's sales quotas for 2009.

141.    According to CW1, the sale of Genoptix's services was also negatively impacted by cancer doctors, Genoptix's primary customers, moving out of private practice and into the hospital setting.  This trend began in 2009 and its impact grew dramatically beginning in 2010.  Due to problems and delays in receiving reimbursements from insurance companies, among other things, doctors were finding it too expensive to run their own practices and were electing to become a salaried doctor on a hospital's staff.  As such, the hospitals handled all administrative and reimbursement matters that caused much of the expense of running a private medical practice.

(a)     It was much more difficult for Genoptix to penetrate this pool of physician customers that became hospital business because hospitals typically had contracts with managed care providers for testing services.  Genoptix typically did ***not*** operate as an in-network service provider. CW1 confirmed physicians that had previously operated their own private practice – and had utilized Genoptix services despite their out-of-network status – were directed by the hospitals to use in-network testing service providers.

1       (b)    According to CW1, such trends were not reported in the "notes" section of the

2 sales software system used by Genoptix sales representatives, and sales personnel were advised by

3 sales managers to think "how this [notes] would look in legal proceeding."

4       142.    According to CW1, sales quotas were issued to salespersons on a monthly basis,

5 rather than receiving an overall, annual goal, and the quota increased each month.  CW1's sales

6 quota for 2009 was approximately $1.5 million in total, with the goal for 2010 being approximately

7 20% to 25% higher than the 2009 quota.  According to CW1, only one Genoptix sales representative

8 had hit the $2.5 million mark in annual sales for 2009, and he was the top producing salesman in the

9 entire Company.  The average Genoptix sales representative made around $1.2 million in annual

10 revenue during 2009.  To CW1's knowledge, Genoptix management never solicited or incorporated

11 feedback from sales representatives concerning the feasibility of the sales quotas imposed upon them

12 on monthly, quarterly or yearly bases, and CW1 was never informed how the quotas were

13 formulated.

14       143.    During CW1's tenure at Genoptix as Sales Specialist, CW1 participated in weekly

15 sales calls within his/her district, as well as in national sales conference calls that occurred on a bi-

16 weekly basis.  The national, bi-weekly calls were routinely led by the senior manager just superior to

17 CW1's Regional Manager, who reported directly to defendant Nova during the Class Period.  The

18 national sales calls were typically held every other Tuesday or Wednesday at approximately 4:30 pm

19 EST, and lasted from 20 minutes to 45 minutes or more.

20       (a)    Defendant Nova herself participated in some of the bi-weekly national sales

21 conference calls during the Class Period.  The frequency of Nova's direct participation in these calls

22 increased beginning in 2010, when she participated in as many as half of these bi-weekly national

23 sales calls.

24       (b)    During the weekly (district) and bi-weekly (national) sales conference calls –

25 the latter of which included Nova as a participant – the increasingly negative sales trends

26 experienced by CW1 and the increasing failure for sales reps to meet their quotas were discussed

27 among participants on the call.  The negative trends in customer demand and corresponding sales

28 witnessed by CW1 – namely the detrimental impact of Genoptix operating as an out-of-network

provider as it related to doctors moving to hospitals from private practice, increased in-network competition, and billing problems – were discussed during the bi-weekly national sales calls, including those in which Nova participated.  Notably, CW1 confirmed that in response to hearing abut these negative trends, Nova's typical response was supportive and sympathetic, encouraging the sales force "to do [their] best" in light of the circumstances.  Other Genoptix sales representatives, in addition to CW1, discussed that they were experiencing a steady decrease in the sales of Genoptix services for the same reasons as CW1.  According to CW1, certain regions, including California and Nevada, were experiencing particularly severe problems.

(c)     Following each of these bi-weekly national calls among sales representatives and management, an email was distributed to the individuals CW1 understood to be all call participants by senior sales manager Burt De Mill's assistant.  These emails recapped what was discussed during the calls, and also set forth sales representatives' rankings in terms of sales as compared to their quotas.

(d)     According to CW1, based on the discussions during bi-weekly national sales calls where Nova participated, the "***best*** outlook" for Genoptix's business model was "stagnant" sales rather than continued growth, and as such CW1 would ***not*** have recommended purchasing Company stock at that time.

144.     Beginning in 2010, CW1's District Manager accompanied CW1 on sales calls to doctors' offices once every two weeks, whereas previously CW1's manager had travelled with CW1 once every three months.  According to CW1, this allowed the District Manager to directly witness the negative sales trends CW1 was experiencing.

145.     According to CW1, Genoptix knew it was losing its largest account, with the Georgia Cancer Center, by mid-2009.  The Company actually lost the account by the beginning of 2010. CW1 knew about the loss of the Georgia Cancer Center based on conversations he/she had with one of three sales representatives that were assigned to this major account.  It was also discussed among sales representatives generally because of the magnitude of the loss.

146.     CW2 was employed as an Oncology Sales Representative from 2008 through the end of the Class Period.  During 2009, CW2's territory covered Oregon, Washington, Idaho and Alaska.

In 2010, CW2's territory was reduced to Washington and Alaska.  In 2009, CW2 was facing such difficulty in selling Genoptix services in his/her territory that CW2 sold all shares he/she personally held in Genoptix stock.  CW2 noted Company employees had very limited windows in which they could sell their shares that lasted approximately two to three weeks.

147.   According to CW2, by 2009 the bone marrow testing market for the Company's core diagnostic services had become so "saturated" with competitor labs, the negative effect of which was amplified by Genoptix's position as an out-of-network provider.  CW2 confirmed that beginning in 2009 and throughout the Class Period, certain customers were increasingly directing their business to in-network service providers for financial reasons, regardless of the quality of Genoptix's services.

148.   According to CW2, a key factor in the significant decline in sales volumes in 2010 was the loss of Genoptix's single largest customer Georgia Cancer Center, which during 2009 had accounted for $15 million to $20 million in annual revenue and a minimum of approximately $1.5 million in monthly revenue.  CW2 was aware of the status of the Georgia Cancer Center account in 2009 and 2010 based on conversations with the sales manager assigned to the account, who was intimately involved in the negotiations concerning the Georgia Cancer Center.  Former Senior Vice President of Sales Burt de Mill had also been involved in some aspects of the discussions between Genoptix and the Georgia Cancer Center.

149.   In 2009, and going into early 2010, CW2 was aware the Georgia Cancer Center had informed Genoptix it wanted to switch from the current billing arrangement, where the Company billed insurance companies for testing services it performed for the Georgia Cancer Center patients, to a "client-billing" relationship.  In a client-billing arrangement, according to CW2, Genoptix would have billed the Georgia Cancer Center a flat rate for each diagnostic testing service it performed, with the Georgia Cancer Center, in turn, billing its patients' insurance companies at potentially higher rates.  Such arrangements are permitted in some states, including Georgia, but not others, such as Washington and Oregon.  According to CW2, however, beginning in 2009, Genoptix management outright refused to enter into the client-billing arrangement requested by the Georgia Cancer Center.  CW2 stated that Company management was confident the Georgia Cancer Center would never give up the quality of Genoptix's diagnostic testing services for financial reasons – but

1    in fact the Georgia Cancer Center did stop using the Company's services and began using a

2    competitor.  As a result, the Company had lost all of the Georgia Cancer Center's business by at

3    least February 2010.  According to CW2, the loss was a "huge blow" to Genoptix and was discussed

4    among various sales personnel throughout the Company.

5         150.    CW3 was employed as a Senior Oncology Sales Specialist at Genoptix from February

6    2008 through February 2010, when CW3 departed the Company on his/her own accord.  CW3

7    worked in the Ohio area.

8         151.    According to CW3, in 2009 and until he/she left in February 2010, the market for

9    Genoptix diagnostic testing services had become increasingly "saturated" with competitors, which

10   had the direct effect of making Company sales representatives' quotas even more difficult to

11   achieve.  This contributed to CW3's decision to leave Genoptix in February 2010.

12        152.    CW3 confirmed that by the time he/she left Genoptix, the Company had failed to

13   develop a plan to expand into lucrative hospital accounts or "partner" with local pathologists, who

14   typically acted as major competitors.  According to CW3, many doctors that used Genoptix's

15   services were unwilling to divert all diagnostic testing revenues away from local pathologists.

16        153.    According to CW3, Genoptix was unwilling to enter into any "client-billing"

17   arrangement in the states where it was permitted.  CW3 knew, for example, that during 2009 and

18   into 2010, a sales representative in the Chicago area was losing customers as a direct result of the

19   Company's refusal to accommodate those specifically requesting a client-billing scenario.  CW3

20   confirmed that during this time, sales representatives nationwide were experiencing similar declines

21   in business, particularly in the western United States and Georgia and including the outright loss of

22   certain customer accounts to competitors, due to the Company's rejection of any client-billing

23   arrangement.

24        154.    CW4 was employed at Genoptix in the Human Resources department ("HR") for

25   nearly four years and throughout the Class Period.  CW4 was named Human Resources

26   Administrator in August 2007, and was promoted to the position of Compensation, Benefits and

27   Systems Analyst in January 2010.  CW4 performed a variety of human resource related activities as

28   Human Resources Administrator, and then served a more sophisticated role as Compensation,

1    Benefits and Systems Analyst, primarily focused on the administration of employee benefits.

2    Following CW4's promotion in early 2010, CW4 reported to one individual who in turn reported to

3    the Senior Vice President of HR.  The Senior VP of the HR reported directly to defendant Nova.

4          155.     According to CW4, Genoptix was seeking to hire new sales representatives during

5    2009 and 2010.  During the first half of 2010, however, the Company "couldn't hire [sales

6    personnel] fast enough" following turnover of between 25% and 35% of sales representatives during

7    this time.  When CW4 was at the Company, management anticipated the departure of a larger

8    number of sales representatives during the first quarter of a year, following receipt of year-end

9    bonuses, compared to other periods.

10         156.     CW4 knew based on informal conversations with Genoptix's Client Services Account

11   Manager, who was in charge of all regions (referred to internally as "pods") of the United States and

12   who often discussed testing sample volume trends with lab managers, that the volume of test

13   samples was significantly declining by at least early 2010.  Prior to that time, daily "specimen count"

14   could regularly reach 370, whereas after that time the daily volume of test samples hovered around

15   200.  According to CW4, and based on his/her conversations with the Client Services Account

16   Manager, these trends were a result of reduced demand from doctors due to economic reasons.  CW4

17   knew by early 2010 that physicians were closing their private practices, which negatively impacted

18   testing volumes.

19         157.     CW5 was employed at Genoptix as a Senior Resources Business Partner from April

20   2010 through January 2011.  In this position, CW5 was responsible for employee relations,

21   organizational development and compensation for the Company's lab division.  CW5 reported to the

22   Director of Employee Services until September 2010, when CW5 began reporting directly to the

23   Senior Vice President of HR.  Prior to joining Genoptix, CW5 worked extensively in the medical

24   testing field, and was familiar with hospital operations from prior employment.  CW5 previously

25   worked as Human Resources Manager at Comprehensive Cancer Centers of Nevada for

26   approximately three years, and as Director of Human Resources at the University of Nevada School

27   of Medicine for the same length of time.

28

158.    CW5 felt misled by Genoptix since the beginning of his/her employment there. During CW5's interviewing and recruiting process, he/she was told by the Director of Employee Services that the Company was "on the upswing" with tremendous growth potential.  CW5 learned immediately this was not an accurate description of Genoptix's business and financial position.  By that time, the Company was experiencing decreased demand and thus reduced volumes of incoming test samples.

159.    According to CW5, beginning in 2009, many oncologists in private practice were closing their offices for economic reasons in favor of working at a hospital, and thus Genoptix had to start penetrating the hospital market and developing hospital accounts.  CW5 attended HR meetings during the Class Period where the Senior Vice President of HR briefed HR employees as to how Genoptix was doing overall.   Although it was discussed during these meetings that Company management had plans to target hospital accounts in the same manner as its sales reps called on physicians in private practice, which consisted of sales representatives visiting physician customers on certain days, CW5 believed at the time, based on his/her experience at Genoptix and elsewhere, that a more "in-depth" partnership with a hospital was necessary to obtain its diagnostic testing samples.  Despite this trend, which was decreasing doctors' demand for Genoptix services, Company management was unwilling to give hospitals any price concessions, give a portion of reimbursement it may receive from insurance companies to hospitals or have personnel on-site to develop the relationship necessary to secure the hospitals' volume of the diagnostic testing.  Hospitals wanted testing personnel to be located physically at the hospital so as to ensure the fastest possible turnaround time on the test samples, ideally within the same day as the specimen was submitted. Genoptix was unable to match this turnaround time.  CW5 was aware Genoptix competitors such as Quest and Labcorp, however, were willing to give hospitals a percentage of the reimbursement they received from patients' insurance companies and essentially rent space at the hospital to keep testing and other personnel on-site.   This resulted in the competitors developing the type of constant and flexible relationship necessary to get hospital business.

160.    As discussed above, CW5 became aware upon arriving at Genoptix in April 2010 that testing volume samples were declining, and knew based on conversations with other personnel that

1    this had been the trend since before CW5 began working at the Company.  From April 2010 on,

2    CW5 saw no signs of demand increasing again.  CW5 was privy to information concerning incoming

3    test sample volumes  through a daily e-mail CW5 received from a member of Genoptix's logistics

4    team as part of his/her task of assessing staffing requirements as part of his/her job.  The e-mail

5    showed daily sample volumes, and shortly after arriving at the Company, CW5 began to keep a

6    spreadsheet reflecting day after day specimen counts in order to assess whether lab staffing levels

7    were adequate or possibly excessive.  CW5 knew these daily e-mails were also distributed to senior

8    management.  Based on the decreasing testing volumes Genoptix was receiving, CW5 confirmed

9    Company labs were overstaffed  with testing personnel, however management made no effort to

10   properly align lab staff to the lower incoming specimen count.

11          161.   CW5 knew based on his/her participation in HR meetings led by the Senior VP of HR

12   that Genoptix had been trying to grow its sales force since before CW5 arrived at the Company until

13   after the Class Period end.  According to CW5, employee turnover was highest in Genoptix's sales

14   division.

15          162.   CW6 was employed at Genoptix as an Oncology Specialist – a sales position – from

16   2007 until June 2009, when he/she left for personal reasons.  As part of CW6's job duties in this

17   role, he/she was responsible for calling on and trying to sell the Company's diagnostic testing

18   services to private practice physicians in North Dakota, South Dakota, Iowa and Nebraska.  CW6

19   experienced a significant amount of competition for sales in this region.  In fact, CW6 lost a portion

20   of his/her largest customer's business, representing $40,000 a month in revenue, to competitors.

21          163.   According to CW6, certain of Genoptix's business practices caused anger and

22   frustration on the part of physician customers as well as patients. As part of the Company's billing

23   process as an out-of-network provider of medical services, the insurance companies that Genoptix

24   billed for it diagnostic testing services on behalf of patients generated EOBs that were sent to

25   patients and designated a large sum of money as being due to Genoptix.  It was unclear to many

26   patients that this amount was what the insurance company had to pay Genoptix, rather than the

27   patient's responsibility.  CW6 was specifically informed by doctors that patients were calling their

28

1   offices, upset about the confusing, outstanding balance listed on their EOB.  This resulted in

2   increasing doctor dissatisfaction with Company services.

3       164.    CW6 knew that after his/her departure, based on conversations with existing

4   personnel, that the Company lost at least two major customer accounts – TOPA Technology and

5   another customer in Oklahoma – in 2010.

6       165.    The credibility and reliability of the CWs who worked in sales roles at Genoptix is

7   confirmed by defendants' own statements.  During the October 7, 2008 William Blair & Co. Small-

8   Cap Growth Stock Conference, for example, defendant Schuling assured the market that the

9   Company had

10      a very metric-driven organization, accountability at all levels of the organization.
        ***From a sales standpoint, every one of our sales reps know on a daily basis what's***
11      ***going on, what their customers are ordering***, volumes, if there's any issues at
        customer sites, vacations; we see it all.  So we pride ourselves on measuring and
12      reporting all types of details within the organization.

13                                          **SCIENTER**

14      166.    As alleged in the following paragraphs, defendants had actual knowledge of the

15  falsity of their Class Period statements or acted in reckless disregard of the truth or falsity of those

16  statements.  In issuing misleading guidance, defendants acted with actual knowledge.  In omitting

17  material facts that should have been disclosed to make defendants' statements not misleading,

18  defendants acted with actual knowledge or deliberate recklessness as to the possibility of misleading

19  investors.  In doing so, defendants committed acts and participated in a course of business that

20  operated as a fraud or deceit on purchasers or acquirers of Genoptix's stock during the Class Period.

21      167.    The Individual Defendants were Genoptix's top executive officers charged with not

22  only developing Genoptix's business strategy – which focused primarily on growth in revenues

23  based on a growing sales force – but also overseeing the implementation and execution of that

24  strategy during the Class Period.

25

26

27

28

**Defendants Assured Investors They Consistently Tracked Sales Volumes and Trends Concerning Its Core Product**

168. Defendants repeatedly emphasized, leading up to and during the Class Period, that defendants operated a metric driven Company wherein defendants traced numerous different statistics concerning customer demand and sales volumes – and thus revenues. For example:

- The Company's Class Period SEC filings repeatedly assured investors: "***Our management team has created a culture of accountability*** throughout the organization in which *we track the performance of our services real time and use our extensive internal systems and processes to continuously measure the performance of our business operations*. . . . We believe that our metric driven culture results in higher quality services, increased customer satisfaction and improved productivity."

- Class Period SEC filings also assured investors: "Our management tracks and measures the general buying patterns of our hem/onc customers (including cases per month, revenues and cost of revenues per case and turn-around-time per case) and is focused on adding additional sales management and sales representatives in key markets to enhance our penetration in those markets."

- Riccitelli stated during Genoptix's November 2008 earnings conference call that "***cases per customer per month***" is "***obviously[] a key metric that we track here literally daily***."

- Schuling stated during a March 16, 2009 presentation: "***Our Company is and always has been very metric driven, very focused on tracking real-time results and I think has a lot to do with the success of Genoptix up to now***." He also confirmed that "***we track them very, very closely in terms of physicians who may not have ordered in a 30-day period or a 60-day period***."

- Riccitelli assured investors during a September 21, 2009 presentation that the retention of doctor customers was "***something we measure probably 1000 different ways in our company***."

- Schuling reiterated during a January 25, 2010 presentation: "On the operations side, again, *we are a very metric-driven organization. Accountability at all levels. Everything is shared with management and all the way down through the organization*."

- Schuling stated during the Company's May 6, 2010 earnings conference call: "***We build very detailed models as it relates to, again, assimilating new reps into our model***."

- An analyst even recognized during the May 6, 2010 call that Genoptix's "systems are good enough" to track volumes. Riccitelli responded, "***we know on a daily basis what's coming in from just about anywhere*. . . . *There's no lag in our metric***." Nova confirmed during the call that defendant tracked volume data "from everybody."

- During a May 11, 2010 presentation, in response to an analyst's question requesting additional detail concerning doctor customers, Riccitelli stated: "***The way we speak to that primarily is in this metric that Tina [Nova] already touched on*** that is

1   measured at the most recent 30 days how many physician customers ordered in that period of time."

2

3   169.   Furthermore, according to defendant Riccitelli during the Bank of America Securities

4   Mid Cap Conference on September 21, 2009, the negative trends impacting the diagnostic testing

5   services provided during the Class Period were the Company's "bread-and-butter core product[s]."

6   **Defendants' Class Period Insider Selling, Criticized by Analysts and the Media, Supports a Strong Inference of Scienter**

7   170.   The Individual Defendants were highly motivated to keep the price of shares of

8   Genoptix stock artificially inflated throughout the Class Period, including during 10b5-1 trading plan

9   windows wherein sales were generally triggered by high share prices.  According to SEC Forms 4

10   filed by Genoptix insiders, the Individual Defendants sold shares of Genoptix stock in manners

11   suspicious in both timing and amount.

12   171.   **Defendant Nova**:  Between August 5, 2009 and April 6, 2010, Nova disposed of a

13   total 102,978 shares of Genoptix stock at prices between $30.34 and $36.45 per share, reaping

14   $3,379,081 million in proceeds.  The largest of these transactions was on April 6, 2010, just one

15   month before defendants made a partial disclosure on May 6, 2010 and approximately two months

16   before defendants were forced to downwardly revise guidance to more accurately reflect true

17   demand at the end of the Class Period. On April 6, 2010 alone, Nova disposed of 20,900 shares at a

18   near Class Period high of $36.45, for proceeds of over $760,000.  Nova sold off a total of 22.52% of

19   her stock in the Company during the Class Period.  Although the sales were made according to a

20   10b5-1 plan, as discussed further below, they were made at a time defendants knew but failed to

21   disclose material adverse facts to investors, and as such, ran contrary to the policy behind 10b5-1

22   plans as well as the Company's stated corporate culture that adhered to integrity and transparency.

23   In contrast, Nova only sold 1,624 shares of Genoptix stock since the Class Period ended.  Similarly,

24   Nova only sold 83,331 shares in the year leading up to the Class Period.

25   172.   **Defendant Riccitelli**:  Between August 10, 2009 and April 9, 2010, Riccitelli

26   disposed of a total 35,038 shares of Genoptix stock at prices between $29.20 and $36.64 per share,

27   reaping $1,183,622 million in proceeds. The largest of these transactions was on April 9, 2010.  On

28   April 9, 2010, Riccitelli disposed of 9,740 shares at a near Class Period high price of $36.64, for

1   proceeds of over $356,000.  Riccitelli sold off a total of 17.63% of his stock in the Company during

2   the Class Period.  Although the sales were made according to a 10b5-1 plan,  as discussed further

3   below, they were made at a time defendants knew but failed to disclose material adverse facts to

4   investors, and as such, ran contrary to the policy behind 10b5-1 plans as well as the Company's

5   stated corporate culture that adhered to integrity and transparency.  In contrast, Riccitelli has not sold

6   a single share of Genoptix stock since the Class Period ended and the artificial inflation was

7   removed from the Company's stock price.

8          173.    **Defendant Schuling**:  Between August 13, 2009 and April 13, 2010, Schuling

9   disposed of a total 34,640 shares of Genoptix stock in the range of $29.41 and $37.32 per share,

10   reaping $1,173,995 million in proceeds.  During this period, Schuling sold off 21.58% of his stock in

11   the Company.  Two of Schuling's largest transactions occurred on January 14, 2010 and April 13,

12   2010.  On January 14,2010, Schuling sold 7,582 at a near Class Period high price of $35.71, for

13   proceeds of over $270,000.  On April 13, 2010, Schuling disposed of 7,582 shares at a near Class

14   Period high price of $37.32 for proceeds of over $282,960.  Although the sales were made according

15   to a 10b5-1 plan, as discussed further below, they were made at a time defendants knew but failed to

16   disclose material adverse facts to investors, and as such, ran contrary to the policy behind 10b5-1

17   plans as well as the Company's stated corporate culture that adhered to integrity and transparency.

18   In contrast, Schuling has only sold 1,562 shares of Genoptix since the Class Period ended and the

19   artificial inflation was removed from Genoptix's stock price.

20          174.    The Individual Defendants' Class Period sales of Genoptix stock were made at a time

21   defendants were making misstatements to the market that were causing the Company's stock price to

22   be artificially inflated.

23          175.    Notably, according to Genoptix's April 20, 2010 Proxy Statement, during the Class

24   Period the only way for defendants to obtain Company stock was as part of executive compensation

25   programs.  Furthermore, during Genoptix's July 29, 2010 2Q10 earnings conference call with

26   analysts and investors in which the Individual Defendants participated, Nova confirmed the

27   defendants made all stock sales under a plan – but did not note she could alter that plan during the

28

Class Period: "***And you know we sell everything under a 10b5***." Consistent with these sales, Nova further stated: "***There has been no purchasing***" by defendants of shares of Genoptix stock.

176.   A September 4, 2009 Caris & Company analyst report, however, described the plan as directly benefitting from higher Genoptix stock prices, which were maintained as a result of their false and misleading statements to the market:

> ***A 10B5-1 plan was put in place in September 2008*** and executives have been selling between 2%-4% of their stock options per month this year.  Based on the recent selling activity ***it appears that the 10B5-1 plan stipulates larger sell orders when the stock is above $30/share***.

177.   Importantly, ***the Individual Defendants amended their 10b5-1 trading plans during the Class Period*** – including on September 16, 2009 and March 16, 2010 in the midst of issuing false and misleading statements to the market that caused Genoptix's share price to remain artificially inflated.  The Individual Defendants then executed Class Period insider sales pursuant to these amended plans.

178.   Finally, despite being made pursuant to 10b5-1 plans, the Individual Defendants' Class Period insider sales of Genoptix stock were inconsistent with the policy behind 10b5-1 trading plans and the corporate culture and values touted by defendants to the market.  According to the Genoptix website, the Company adheres to the following values:

> **Corporate Culture** . . . As shareholders, we all share a sense of ownership in the company's successes – and we acknowledge that ours is a "life and death" business, thus we are committed to always provide our best efforts for our customers and their patients.

> **Values** . . . **Integrity** – We believe in honest and forthright business practices and compliance with all applicable laws and regulations.  We believe that ethical business practices help us to maintain credibility and a competitive edge. . . . **Open Communication** – Open doors and open minds leads to trust and commitment at all levels of the organization.  We value honesty and transparency, both as individuals and as a corporation.

The Individual Defendants' insider sales, when they were making misleading statements about Genoptix and thereby artificially inflating the Company's stock price, run counter to the Company's stated values of "integrity" and "transparency."

179.   A February 16, 2010 article in the *Street Sweeper* criticized of the Individual Defendants' Class Period insider sales and resulting decrease in Company stock ownership.  Nova

1   and Riccitelli disposed of thousands of shares of cheap stock options years before those options were

2   formally set to expire.  For example, Nova made a February 3, 2010 sale of 16,700 shares at $31.13

3   a share.  This sale was made "near a four-month low – even though analysts were forecasting a $10

4   rise in the company's share price," indicating her expectations Genoptix would not meet analyst

5   estimates.  Nova pocketed more than $500,000 from this one transaction alone.  As alleged herein,

6   despite analyst optimism, defendants knew it was inevitable the price of Genoptix shares would

7   decrease.  The article also reported that Nova sold $850,000 worth of Genoptix stock, just a week

8   before the Company made an aggressive presentation to outside investors in January 2010 that

9   plaintiff alleges was false and misleading.  Riccitelli also made a significant *sale of his Company*

10  *stock on the same day as the* "*upbeat presentation* in January 2010."  The article reported:

11  "*Genoptix critics view the sales as downright aggressive . . . since they've left senior executives*

12  *with little direct ownership of the company's stock*."  The article emphasized that since defendants

13  directly owned very little Company stock following their insider sales, they will "*largely escape any*

14  *future pain felt by ordinary investors*."

15      180.    Notably, during a May 6, 2010 conference call, an analyst expressed "frustration"

16  with defendants leaving a build up of "cash on the balance sheet."  He also commented:  "*We've*

17  *certainly seen the management insiders selling*."  In reply, Schuling discussed the Company's cash,

18  but *did not* address the analyst's comment recognizing significant Class Period insider selling by

19  defendants.

20  **Executive Compensation**

21      181.    The Individual Defendants were highly motivated to artificially inflate Genoptix's

22  financial condition and prospects, as described herein, in order to receive millions of dollars in

23  executive compensation based on artificially inflated Company performance metrics, *including the*

24  *addition of sales representatives*, during the Class Period.

25      182.    According to Genoptix's Proxy Report filed with the SEC on April 20, 2010 (the

26  "Proxy"), during the Class Period the Company's Board of Director's Compensation Committee

27  evaluated and set defendants' executive compensation based on Company performance metrics.  In

28  discussing the Individual Defendants' 2009 executive compensation, the Proxy confirmed the:

Compensation Committee also considered our actual performance as measured against the key performance objectives set forth in our annual operating plan, including revenue, business growth and profitability objectives. Our Compensation Committee also considers key executive contributions leading to attainment of, or achievement in excess of, those objectives. Our Compensation Committee evaluated the overall performance of Genoptix as well as the individual contributions of our executive officers (because attainment of certain performance objectives may result primarily from the extraordinary performance of one or more of our executive officers). *During 2009, our key corporate accomplishments included: exceeding revenue targets; substantially exceeding operating income targets; substantially exceeding earnings-per-share targets; consistent increases in test orders . . . . During 2009, our executive officers substantially exceeded the key performance objectives included in our annual operating plan*.

183.   Despite defendants' acknowledgement following the Class Period that increased economic pressure on doctors was contributing to decreasing the case volumes and Company revenues, the April 20, 2010 Proxy further reported:

> *The continued adverse economic conditions have not substantially impacted our business, and thus, our compensation decisions*.

184.   Genoptix's April 20, 2010 Proxy described Nova's role in determining executive compensation for Riccitelli and Schuling:

> Our *chief executive officer typically evaluates the performance of other executive officers* and employees on an annual basis and makes recommendations to our Compensation Committee with respect to annual salary adjustments, bonuses and annual equity awards.

185.   The Individual Defendants' performance-based executive compensation consisted of base salary and cash bonus, among other forms of compensation:

(a)   Base Salary:

(i)   Upon review of the Company's and defendants' performance in December 2009, the Compensation Committee increased 2010 base salaries over 2009 base salaries as follows:  Nova's increased from $555,000 to $570,000; Riccitelli's increased from $415,000 to $465,000; and Schuling's from $335,000 to $365,000.

(ii)   The April 20, 2010 Proxy states: "In approving these base salary adjustments, our Compensation Committee reviewed the executive compensation analysis provided by [an outside consultant], *the high level of performance and substantial commitment demonstrated by each of our executive officers during 2009*, their particular duties and additional or changing responsibilities, the amount of prior year increases, *our financial performance to date in 2009, including our performance against our operating plan for 2009, including substantially exceeding our profitability objectives set forth in the 2009 operating plan and the satisfaction of other performance measures and objectives included in our operating plan . . . .*"

(b)    Annual Executive Performance Cash Bonus Plan:

(i)    According to the April 20, 2010 Proxy:

In December 2009, our Compensation Committee reviewed the actual performance of our executive officers during 2009 to date and awarded discretionary annual cash bonuses for 2009 performance as follows: $888,000 to Dr. Nova, $342,375 to Mr. Riccitelli, $251,250 to Mr. Schuling . . . . Each of these bonus amounts was at the high end of the target bonus range under the 2009 Annual Executive Bonus Plan.  In awarding these discretionary bonus amounts for 2009, our Compensation Committee considered (1) individual performance against individual goals based on each executive officer's respective area of responsibility and the achievement of the performance measures and objectives included in our operating plan for 2009, (2) the high level of performance and substantial commitment demonstrated by each of our executive officers . . . and (4) our performance against our operating plan for 2009, including substantially exceeding our profitability objectives set forth in the 2009 operating plan and the satisfaction of other performance measures and objectives included in our operating plan . . . .  These discretionary bonuses were paid entirely in December 2009 and are reflected in the column titled "Non-Equity Incentive Plan Compensation" of the Summary Compensation Table . . . .

186.    The following table reflects executive compensation received by defendants, based almost exclusively on Company performance, during FY09:

| Name & Principal Position | Year | Salary ($) | Stock Awards ($) | Option Awards ($) | Non-Equity Incentive Plan Compensation ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|
| Tina S. Nova, Ph.D, President and Chief Executive Officer | 2009 | $555,000 | $696,420 | $682,606 | $888,000 | $30,610 | **$2,852,636** |
| Samuel D. Riccitelli, Executive Vice President and Chief Operating Officer | 2009 | $415,000 | $305,505 | $299,445 | $342,375 | $21,040 | **$1,383,365** |
| Douglas A. Schuling, Executive Vice President and Chief Financial Officer | 2009 | $335,000 | $229,950 | $223,779 | $251,250 | $23,006 | **$1,062,985** |

187.    Genoptix did not file with the SEC a Proxy Statement in 2011 reflecting corresponding 2010 executive compensation data for 2010.  But according to an Form 8-K filed by

Genoptix on December 21, 2010, on December 16, 2010, the Compensation Committee awarded *performance bonuses under the 2010 Annual Executive Bonus Plan* of $363,375 to Nova; $226,688 to Riccitelli; and $136,875 to Schuling. Base salaries and cash bonus targets, according to the December 21, 2010 Form 8-K, for 2011 remained the same as for 2010, presumably based on the Company's relatively poor financial performance in 2010.

188.    Furthermore, according to Nova's employment agreement with Genoptix dated November 5, 2008, which was in effect during the Class Period, Nova could have been terminated "For Cause" if Genoptix learned, among other things, of:

> *Executive's attempted commission of, or participation in, a fraud or act of dishonesty against the Company* . . . .

Nova's November 2008 employment agreement further provided:

> *In the event Executive's employment is terminated for Cause*, the Company shall have *no further obligation to Executive other than to pay* all compensation and expense reimbursements owing *for services rendered* and reasonable business expenses incurred by Executive prior to the effective date of such termination.

189.    Virtually identical provisions concerning termination for cause were contained in Genoptix's employment agreements with both Schuling and Riccitelli as well, which were executed in November 2008 and in effect during the Class Period.

190.    Analysts were critical of defendants' failure to provide the market with a more detailed description of the performance metrics upon which executive compensation was based. At the start of the Class Period, during Genoptix's July 30, 2009 2Q09 earnings conference call, Banc of America-Merrill Lynch analyst Robert Willoughby asked about the defendants' performance based compensation based on financial metrics at the Company:

> And as it relates to the *incentive comp payment* that you ultimately receive, I mean, is that target moving higher as well? I mean the goals that you have to hit or are we still – are you guys still getting paid on the initial estimate for the year?

Defendant Riccitelli responded:

> Well, you know, the goals that we have set internally that all of our team, for every employee in the Company benefits from in some respect *don't necessarily exactly match the numbers that we share externally*, as you would probably expect. So *I don't think it's further – it's prudent to comment really any further than that*.

191.   Similarly, on July 29, 2010, during Genoptix's 2Q10 earnings conference call with analysts and investors in which the Individual Defendants participated, Bank of America analyst Robert Willoughby questioned defendants about the lack of clarity of the Company's disclosures concerning incentive driven executive compensation:

> It's not clear from the proxy statement what weightings are being put on the drivers of incentive compensation for senior management.  There's a whole host of things. But I do see *you receive some compensation for adding capacity*.  And I guess a critic might say that this might have *driven some of the sales force* and laboratory *additions ahead of a slowdown that was maybe more visible to some of your competitors*.  So I guess I'm trying to figure out what weight was actually tied to hiring personnel and how much was really tied to facility expansions this past year?

Schuling responded:

> *We don't share the details of the specific compensation plans*.  But suffice it to say, we all are fully engaged and accountable for growing the business and returning shareholder value.  And growing that top line is important to us.

Nova jumped in and stated:

> *I'm not sure what you're implying Bob, but be assured that we're not doing anything different this year than we've done any year*.  We're trying to grow this Company the best we can grow.

Analyst Robert Willoughby pressed for more information during the July 29, 2010 conference call:

> Well, I'm just a firm believer that management will hit their targets and *it would just be helpful if there was incremental granularity in that proxy statement that could help us figure out what the metrics are that are important to you*.  It might facilitate modeling and forecasting on our end.  Do you anticipate any changes in the compensation program itself for the coming year?

Nova responded:

> I don't know how we can comment on compensation.  We're in the middle of 2010. We don't talk about compensation for this year in the middle of the year.

**SOX Certifications**

192.   Genoptix's executive management, and specifically Nova and Schuling, were responsible for evaluating the Company's internal controls over financial reporting and reporting the

results of their evaluation to investors in Genoptix's Form 10-K. The following disclosure appeared in the Company's Forms 10-K during the Class Period:

> ***Our management is responsible for establishing and maintaining adequate internal control over financial reporting***, as such term is defined in Rule 13a-15(f) of the Exchange Act.  ***Under the supervision and with the participation of our management, including our chief executive officer and chief financial officer***, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework set forth in *Internal Control-Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission.  ***Based on our evaluation . . . , our management concluded that our internal control over financial reporting was effective as of December 31, 2010***.

193.    As part of their responsibility, defendants Nova and Schuling signed the following SOX certifications in the each of the Forms 10-Q and Forms 10-K during the Class Period in which they: (1) certified that they had performed evaluations of Genoptix's financial statements, disclosure controls and internal controls over financial reporting; and (2) as a result of their evaluations, they were certifying the accuracy of Genoptix's financial statements and the effectiveness of Genoptix's disclosure controls and internal controls over financial reporting:

I, [President & Chief Executive Officer or Chief Financial Officer], certify that:

1.    ***I have reviewed*** this [annual report on Form 10-K or quarterly report on Form 10-Q] of Genoptix, Inc.;

2.    Based on my knowledge, ***this report does not contain any untrue statement of a material fact*** or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, ***the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant*** as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer[s] and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

> a)    designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)       designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)       ***evaluated the effectiveness of the registrant's disclosure controls*** and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)       disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of [an] annual report) that has materially affected, or is reasonable likely to materially affect, the registrant's internal control over financial reporting; and

5.       The registrant's other certifying officer[s] and I have disclosed, based on ***our most recent evaluation of internal control over financial reporting***, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)       all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)       any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: [_____]          By: /s/ [_____]

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS ARE NOT PROTECTED BY SAFE HARBOR

194.     The PSLRA's statutory safe harbor does not protect any of the allegedly false statements pleaded in this Complaint.  First, many of the specific statements pleaded herein discussed current facts and thus were not "forward-looking statements."  Second, to the extent defendants made false and misleading forward-looking statements, including their issuance of FY09 and FY10 guidance for Genoptix and as is set forth in detail *supra*, these statements were not accompanied by meaningful cautionary language that specifically and accurately disclosed adverse risks to investors.

**FRAUD-ON-THE-MARKET PRESUMPTION**

195.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine.  This presumption provides, *inter alia*:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    The omissions and misrepresentations were material;

(c)    The Company's securities traded in efficient markets;

(d)    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)    Plaintiff and other members of the class purchased Genoptix securities between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

196.    At all relevant times, the market for Genoptix securities was efficient for the following reasons, among others:

(a)    Genoptix common stock met the requirements for listing, and was listed and actively traded during the Class Period, on the Nasdaq;

(b)    Genoptix common stock was regularly followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and customers of their respective brokerage firms; and

(c)    Genoptix regularly communicated with the public and investors via established market communication mechanisms, including via regular dissemination of press releases on major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

197.    As a consequence, the markets for Genoptix securities digested current information with respect to Genoptix from publicly available sources and reflected such information in the price of Genoptix's securities.  Under these circumstances, all purchasers or acquirers of Genoptix securities during the Class Period suffered similar injury through their purchase of securities at artificially inflated prices and, thus, a presumption of reliance applies.

## PROXIMATE LOSS CAUSATION/ECONOMIC LOSS

198.   During the Class Period, as detailed herein, defendants engaged in a scheme to deceive investors and the market and a course of conduct that artificially inflated and maintained Genoptix's stock price and operated as a fraud or deceit on Class Period purchasers of the Company's publicly traded securities by issuing false statements during the Class Period.  When defendants' misrepresentations and omissions were revealed, Genoptix's stock price fell precipitously as the prior artificial inflation was removed.  As a result of their purchases of Genoptix securities during the Class Period, plaintiff and other members of the class suffered significant economic loss, *i.e.*, damages, under the federal securities laws.

199.   Defendants' false statements and omissions had the intended effect and caused Genoptix's stock to trade at artificially inflated levels.  As a direct result of the disclosures on May 6, 2010 and June 16, 2010, Genoptix's stock price suffered material, statistically significant declines.  These two drops removed the inflation from Genoptix's stock price, causing real economic loss to investors who had purchased or acquired the Company's publicly traded securities during the Class Period.

200.   On May 6, 2010, the Company revealed an unexpected decrease in revenue growth, yet maintained its guidance.  Although defendants blamed a one-time reconfiguration of its sale department and, to a much lesser extent, bad weather, the decrease in customer demand and declining sales trends were not temporary nor primarily the result of the reconfiguration.  The price of Company shares declined following defendants' May 6, 2010 disclosure concerning revenue.  Defendants failed, however, to disclose the true reasons prompting the decline, causing Genoptix's stock price to remain artificially inflated.

201.   The major decline in Genoptix's stock price following Genoptix's disclosures on June 16, 2010 – the last day of the Class Period – was a direct result of the nature and extent of defendants' prior false statements and omissions being revealed to investors and the market.  On June 16, 2010, defendants were forced to reveal decreased revenues and finally lowered Company guidance to more closely match the true demand and sales trends.  The price of Company shares declined as a result of defendants' Class Period ending disclosures.

202.    The timing and significance of these stock price declines negate any inference that the loss suffered by plaintiff and other class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct.  The damages suffered by plaintiff and other members of the class were a direct result of defendants' fraudulent scheme to artificially inflate Genoptix's stock price and maintain the price at artificially inflated levels and the subsequent significant decline in the value of Genoptix's stock when defendants' prior misrepresentations and omissions were revealed.

## CLASS ALLEGATIONS

203.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of purchasers and acquirers of Genoptix securities during the Class Period (the "Class").  Excluded from the Class are the defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

204.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Genoptix's securities were actively traded on the Nasdaq.  While the exact number of class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Genoptix or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

205.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class were similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

206.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

207.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)   Whether the federal securities laws were violated by defendants' acts and omissions as alleged herein;

(b)   Whether statements made by defendants to the investing public during the Class Period misrepresented and omitted material facts about the business and operations of Genoptix; and

(c)   To what extent the members of the Class have sustained damages and the proper measure of damages.

208.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### Violation of §10(b) of the 1934 Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

209.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

210.   During the Class Period, defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were false.

211.   Defendants: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers or acquirers of the Company's publicly traded securities in an effort to maintain artificially high market prices for Genoptix's publicly traded securities in violation

of §10(b) of the 1934 Act and Rule 10b-5.  All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

212.   Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  As such, defendants' material misrepresentations and/or omissions were made knowingly or with a reckless disregard for the truth and for the purpose and effect of supporting the artificially inflated prices of the Company's publicly traded securities.

213.   As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Genoptix's publicly traded securities were artificially inflated during the Class Period.  In ignorance of the fact that the market price of Genoptix's publicly traded securities was artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the markets in which the securities trade and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants, but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired Genoptix publicly traded securities during the Class Period at artificially inflated prices and were damaged when the artificial inflation came out of the securities.

214.   At the time of defendants' false and misleading statements, plaintiff and other members of the Class were ignorant of their falsity and believed them to be true.  Had plaintiff, the other members of the Class and the marketplace known the truth regarding Genoptix's financial statements, that was not disclosed by defendants, they would not have purchased or otherwise acquired their Genoptix publicly traded securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices they paid.

215.   As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's publicly traded securities during the Class Period.

**COUNT II**

**Violation of §20(a) of the 1934 Act**
**Against All Defendants**

216.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

217.    Defendants acted as controlling persons of Genoptix within the meaning of §20(a) of the 1934 Act as alleged herein.  By virtue of their high level positions, participation in and awareness of the Company's operations, and intimate knowledge of the false statements made by Genoptix and disseminated to the investing public, defendants had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements plaintiff contends are false.  The defendants participated in conference calls with investors and were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements, alleged by plaintiff to be misleading, prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

218.    In particular, each of the defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

219.    As set forth above, each of the defendants violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the defendants are liable pursuant to §20(a) of the 1934 Act.  As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's publicly traded securities during the Class Period.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff respectfully prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, and certifying plaintiff as class representative under Federal Rule of Civil Procedure 23;

1      B.      Awarding compensatory damages in favor of plaintiff and the other members of the

2      Class against all defendants, jointly and severally, for all damages sustained as a result of

3      defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

4              C.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in this

5      action, including counsel fees and expert fees; and

6              D.      Such equitable, injunctive or other and further relief as the Court may deem just and

7      proper.

8                                          **JURY TRIAL DEMANDED**

9              E.      Plaintiff hereby demands a trial by jury.

10     DATED: August 10, 2012                          ROBBINS GELLER RUDMAN
                                                         & DOWD LLP
11                                                     X. JAY ALVAREZ
                                                       JULIE A. KEARNS
12

13
                                                       _____s/ X. JAY ALVAREZ_____
14                                                         X. JAY ALVAREZ

15                                                     655 West Broadway, Suite 1900
                                                       San Diego, CA  92101-3301
16                                                     Telephone:  619/231-1058
                                                       619/231-7423 (fax)
17
                                                       Lead Counsel for Plaintiff
18
                                                       VANOVERBEKE MICHAUD
19                                                       & TIMMONY, P.C.
                                                       MICHAEL J. VANOVERBEKE
20                                                     THOMAS C. MICHAUD
                                                       79 Alfred Street
21                                                     Detroit, MI  48201
                                                       Telephone:  313/578-1200
22                                                     313/578-1201 (fax)

23                                                     Additional Counsel for Plaintiff

24

25

26

27

28

1

<u>CERTIFICATE OF SERVICE</u>

2

      I hereby certify that on August 10, 2012, I authorized the electronic filing of the foregoing

3

with the Clerk of the Court using the CM/ECF system which will send notification of such filing to

4

the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I

5

caused to be mailed the foregoing document or paper via the United States Postal Service to the non-

6

CM/ECF participants indicated on the attached Manual Notice List.

7

      I certify under penalty of perjury under the laws of the United States of America that the

8

foregoing is true and correct.  Executed on August 10, 2012.

9

10

                          s/ X. JAY ALVAREZ
                          X. JAY ALVAREZ

11

ROBBINS GELLER RUDMAN
      & DOWD LLP

12

655 West Broadway, Suite 1900
San Diego, CA  92101-3301

13

Telephone:  619/231-1058
619/231-7423 (fax)

14

E-mail:   jaya@rgrdlaw.com

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Mailing Information for a Case 3:10-cv-02502-CAB-DHB

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Peter M Adams**
  padams@cooley.com,smiyajima@cooley.com

- **Xavier Jay Alvarez**
  jaya@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Koji F Fukumura**
  kfukumura@cooley.com,chourani@cooley.com

- **William E Grauer**
  wgrauer@cooley.com,hannummc@cooley.com

- **Julie A. Kearns**
  jkearns@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Mary Kathryn Kelley**
  mkkelley@cooley.com,msalas@cooley.com

- **Rosemary Farrales Luzon**
  rluzon@sfmslaw.com

- **Danielle Suzanne Myers**
  dmyers@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Erik David Peterson**
  epeterson@ktmc.com,knguyen@ktmc.com,arobles@ktmc.com

- **David C Walton**
  davew@rgrdlaw.com,hdemag@rgrdlaw.com,e_file_sd@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)